**Nos. 14-72553, 14-72602**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELPING HAND TOOLS; ROBERT SIMPSON

and

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents,*

SIERRA PACIFIC INDUSTRIES, INC.,

*Intervenor.*

Petition for Review of a Final Decision of the Environmental Protection Agency, 79 Fed. Reg. 35,543 (June 23, 2014)

## BRIEF FOR INTERVENOR SIERRA PACIFIC INDUSTRIES, INC. SUPPORTING RESPONDENTS

WILLIAM M. SLOAN
DAN GERSHWIN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
WSloan@mofo.com
DGershwin@mofo.com

JOSEPH R. PALMORE
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  202.887.6940
JPalmore@mofo.com

*Counsel for Intervenor Sierra Pacific Industries, Inc.*

OCTOBER 9, 2015

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Sierra Pacific

Industries, Inc. certifies that it has no parent companies and that no publicly held

corporation owns ten percent or more of Sierra Pacific Industries, Inc.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES.............................................................1

INTRODUCTION .................................................................................1

STATEMENT OF THE CASE................................................................4

    A.    Statutory And Regulatory Background ................................4

        1.    The PSD program and BACT ....................................4

        2.    BACT as applied to biomass......................................8

    B.    Factual And Procedural Background ..................................11

        1.    Sierra Pacific's PSD permit application .................11

        2.    Issuance of PSD permit............................................12

        3.    Petitions for review before the Environmental Appeals Board ...............................................................13

        4.    Remand proceedings................................................15

        5.    Issuance of modified proposed PSD permit ...........15

        6.    EPA's revisions in response to public comments....19

        7.    Further appeals to the EAB dismissed ....................21

SUMMARY OF ARGUMENT ..............................................................21

STANDARD OF REVIEW ...................................................................25

ARGUMENT .........................................................................................26

I.     EPA'S BACT ANALYSIS SATISFIES THE CLEAN AIR ACT'S REQUIREMENTS ........................................................................26

       A.     EPA Articulated A Rational Explanation Of Its BACT Analysis .....26

       B.     The Center's Challenges To EPA's BACT Determination Are Meritless ............................................................................30

              1.     The Center's challenge to identification of biomass combustion at Step 1 of the BACT analysis is misplaced.......30

              2.     EPA's specification that Sierra Pacific could combust only certain feedstock did not violate the "clean fuels" portion of the statute ................................................35

II.    EPA REASONABLY EXERCISED ITS DISCRETION IN DETERMINING THAT THE PROPOSED FACILITY NEED NOT USE FUELS OTHER THAN BIOMASS DURING NORMAL OPERATIONS ............................................................................38

       A.     EPA Reasonably Concluded That Requiring Sierra Pacific To Use Fuels Other Than Biomass During Normal Operations Would Fundamentally Redefine The Proposed Facility ...................39

       B.     Helping Hand's Arguments To The Contrary Are Unfounded ........45

              1.     EPA did not "read 'clean fuels' out of the statutory definition" of BACT ................................................45

              2.     Helping Hand's arguments are based on a mischaracterization of Sierra Pacific's basic business purposes for the proposed facility.............................................49

              3.     The 10% cap on natural-gas use is consistent with an appropriate BACT analysis....................................................51

       C.     Helping Hand's Argument Concerning The Use Of Solar Energy As Control Technology For Natural Gas Is Waived And, In Any Event, Would Improperly Redefine The Project .........55

CONCLUSION ....................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Dep't of Envtl. Conservation v. EPA*,
  540 U.S. 461 (2004) ............................................................................6

*Chevron U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) .................................................................25, 26

*Ctr. for Biological Diversity v. EPA*,
  722 F.3d 401 (D.C. Cir. 2013) .........................................................14

*Getty Oil Co. v. Andrus*,
  607 F.2d 253 (9th Cir. 1979) ...........................................................56

*In re City of Palmdale*, PSD Appeal No. 11-07, (EAB Sept. 17, 2012) .................41

*In re Desert Rock Energy Co.*,
  14 E.A.D. 484 (EAB 2009), 2009 WL 3126170 ...................41, 47, 53

*In re N. Mich. Univ. Ripley Heating Plant*,
  PSD Appeal No. 08-02, 2009 WL 443976 (EAB Feb. 18, 2009) ....39, 40, 47, 49

*In re Prairie State Generating Co.*,
  13 E.A.D. 1 (EAB 2006), 2006 WL 2847225 .......................53, 54, 55

*Nat'l Ass'n of Home Builders v. Norton*,
  340 F.3d 835 (9th Cir. 2003) ...........................................................25

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
  384 F.3d 1163 (9th Cir. 2004) .........................................................25

*Sierra Club v. EPA*,
  499 F.3d 653 (7th Cir. 2007) .................................7, 39, 40, 41, 46, 47

*United States v. L.A. Trucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ...........................................................................56

*Utility Air Regulatory Grp. v. EPA*,
  134 S. Ct. 2427 (2014) .................................................4, 5, 23, 40, 46

iv

**STATUTES**

5 U.S.C. § 706(2)(A) ................................................................25

42 U.S.C. § 7470 *et. seq.* ..........................................................4

42 U.S.C. § 7475 ........................................................................5

42 U.S.C. § 7475(a)(4) ..............................................2, 5, 33, 39, 46

42 U.S.C. § 7479(3) ...................................................2, 5, 33, 39, 46

**OTHER AUTHORITIES**

40 C.F.R. § 60.44b(d) ...............................................................52

EPA, *Guidance for Determining Best Available Control Technology
    for Reducing Carbon Dioxide Emissions from Bioenergy
    Production* (March 2011) ...........................................8, 9, 10, 11, 48

EPA, New Source Review Workshop Manual,
    Chapter B (Draft Oct. 1990) ......................................6, 7, 48, 52, 54

EPA, PSD and Title V Permitting Guidance for Greenhouse Gases (March
    2011) ........................................................................................6

## JURISDICTIONAL STATEMENT

Intervenor Sierra Pacific Industries, Inc. ("Sierra Pacific" or "SPI") incorporates by reference the jurisdictional statement in the Government's brief.

## STATEMENT OF THE ISSUES

1.      Did the best available control technology requirements imposed by the Environmental Protection Agency ("EPA") when approving a permit for Sierra Pacific's biomass facility comply with the Clean Air Act's requirements?

2.      Did EPA reasonably exercise its discretion in determining that Sierra Pacific's proposed facility need not use fuels other than biomass during normal operations?

## INTRODUCTION

Sierra Pacific is one of the largest lumber producers in the United States. Sierra Pacific has a commitment to sustainability, meaning that it continuously invests in growing new forests, while never harvesting more than it grows. To Sierra Pacific, sustainability also means putting to productive use the hundreds of thousands of bone dry tons of wood waste (i.e., biomass) produced each year as a byproduct of its lumber operations.

To that end, Sierra Pacific sought a permit from EPA to burn its surplus wood waste in a 31-megawatt biomass boiler and turbine cogeneration unit at its lumber facility in Anderson, California. The proposed new cogeneration unit will

burn clean cellulosic biomass in a boiler to produce steam to be used in Sierra Pacific's lumber operation and to generate electricity, some of which will power on-site equipment, with the remainder to be sold to a public utility as electricity.

EPA issued Sierra Pacific a permit, reasonably concluding that doing so complied with the requirements of the Clean Air Act. At issue here is the Clean Air Act's requirement that the proposed facility be subject to the "best available control technology" ("BACT") for each regulated pollutant that will be emitted from the facility—here, greenhouse gases. 42 U.S.C. § 7475(a)(4). Consistent with its regulations implementing the BACT requirement, EPA conducted a five-step analysis to determine BACT for Sierra Pacific's proposed biomass-fueled boiler and cogeneration unit. EPA determined that BACT for greenhouse gases emitted from the proposed boiler is a combination of the following: (1) limiting the biomass fuel to particular types of biomass that have a more limited effect on net greenhouse gases in the atmosphere; (2) energy-efficient design, operation and maintenance; and (3) operation of the facility as a cogeneration unit.

EPA's analysis was thorough, well-reasoned, and consistent with the Clean Air Act's requirements and EPA's own regulations. EPA applied its technical expertise in performing its BACT analysis, and EPA's conclusions are owed substantial deference. There is no basis to set aside EPA's reasonable exercise of its judgment here.

2

Petitioners' attempts to attack EPA's conclusions fall far short. Indeed, many of petitioners' arguments are based on mischaracterization of EPA's conclusions, invented statutory requirements found nowhere in the Clean Air Act, or both. The argument of petitioner Center for Biological Diversity ("Center"), at bottom, is that EPA erred in concluding that "biomass alone" could be BACT for the combustion of biomass fuel. But "biomass alone" is *not* what EPA concluded is BACT for Sierra Pacific's facility. Rather, EPA required the use of specific biomass feedstocks that the Center itself advocated as producing lower net carbon contributions. EPA also required energy-efficient design, operation, and maintenance of Sierra Pacific's cogeneration unit. The Center attacks a strawman rather than the BACT determination that EPA actually adopted.

EPA also reasonably rejected the arguments of petitioners Helping Hand Tools and Robert Simpson (collectively, "Helping Hand") that Sierra Pacific should be required to burn natural gas or implement solar power rather than use 100% biomass fuel during normal operations. EPA correctly concluded that such a requirement would impermissibly redefine Sierra Pacific's proposed project. It is well established that BACT is not a mechanism for compelling a fundamental redefinition of a project. For example, where the proposed project is a coal-fired power plant, EPA would not require that the proposed plant use nuclear or wind rather than coal, as that requirement would fundamentally redefine the project

3

rather than serve as a control technology on the proposed project. EPA reasonably determined that implementing a natural-gas or solar requirement would effectively redefine Sierra Pacific's proposed biomass-fueled boiler and therefore could not be considered as an option in the BACT analysis. That determination is owed deference and is correct.

The petitions for review should be denied.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

#### 1. *The PSD program and BACT*

The Clean Air Act creates a regulatory framework for the prevention and control of air pollution from both stationary and moving sources. *See generally Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2435 (2014). Acting pursuant to its authority under the statute, EPA has developed national ambient-air-quality standards for six pollutants. *See id.* States developing Clean Air Act implementation plans must designate geographic areas within their borders as either "attainment," "nonattainment," or "unclassifiable" for each air-quality standard. *See id.* (citing 42 U.S.C. § 7407(d)).

The aspect of the Clean Air Act at issue here is the Prevention of Significant Deterioration ("PSD") permitting program. 42 U.S.C. § 7470 *et. seq.* The PSD program applies to stationary sources in areas that are either in attainment or

unclassifiable with respect to an air-quality standard. *See Utility Air*, 134 S. Ct. at 2435. Under that program, sources that exceed certain threshold emissions limits must obtain pre-construction permits before undergoing modifications. *See* 42 U.S.C. § 7475.

To obtain such a permit, the proposed facility must, among other things, be "subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility." *Id.* § 7475(a)(4). Although there is no national ambient-air-quality standard for greenhouse gases, EPA treats them as pollutants subject to regulation under the Clean Air Act's BACT requirement. *See Utility Air*, 134 S. Ct. at 2436-37; PER651-652. Accordingly, to obtain a permit, proposed facilities must be subject to BACT for greenhouse gases (provided that those facilities are required to obtain a permit based on their emission of pollutants other than greenhouse gases). *See Utility Air*, 134 S. Ct. at 2447-49; EPA Br. 12-15.

The Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation" that EPA or the state permitting authority "determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant." 42 U.S.C. § 7479(3).

5

To decide whether an emission limitation is "achievable" (and therefore may be BACT), review is performed "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." *Id.*

The statute does not further define the BACT requirement or specify how permitting authorities should apply it. In order to guide BACT determinations, EPA has recommended that permitting authorities follow a five-step, "top-down" approach. EPA formally recommended this approach in a 1990 draft training manual. *See* New Source Review Workshop Manual, Chapter B (Draft Oct. 1990) ("New Source Manual") (attached as an addendum to EPA's brief). In 2011, EPA issued guidance "recommend[ing]" the same top-down approach be followed when conducting a BACT analysis for greenhouse gas emissions. *See PSD and Title V Permitting Guidance for Greenhouse Gases* (March 2011) (PER666-668). The Supreme Court has noted, however, that "[n]othing in the Act or its implementing regulations mandates top-down analysis." *Ala. Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 476 n.7 (2004). EPA has likewise emphasized that it "has not established the top-down BACT process as a binding requirement through rule." PER668.

EPA's top-down BACT analysis is typically applied as follows:

At Step 1, EPA identifies "'available' control options," meaning "those air pollution control technologies or techniques with a practical potential for

application to the emissions unit and the regulated pollutant under evaluation."
New Source Manual p. B.5 (EPA Br. Add. 30). EPA has long emphasized,
however, that it "has not considered the BACT requirement as a means to redefine
the design of the source when considering available control alternatives." New
Source Manual p. B.13 (EPA Br. Add. 38); *see generally Sierra Club v. EPA*, 499
F.3d 653, 655-57 (7th Cir. 2007) (affirming EPA's view that "changing" a
facility's "fundamental scope" is not a "control technology" at Step 1).
Accordingly, EPA has explained that "BACT should generally not be applied to
regulate the applicant's purpose or objective for the proposed facility." PER675.
"For example, applicants proposing to construct a coal-fired electric generator . . .
have not been required by EPA as part of a BACT analysis to consider building a
natural-gas-fired electric turbine although the turbine may be inherently less
polluting." New Source Manual p. B.13 (EPA Br. Add. 38). In determining
whether an option "would fundamentally redefine a proposed source," EPA
recommends that permitting authorities examine "how the applicant defined its
goal, objectives, purpose or basic design for the proposed facility in its
application." PER675.

At Step 2, EPA evaluates the technical feasibility of the alternative
techniques identified at Step 1, and eliminates all that are technically infeasible.
New Source Manual p. B.7 (EPA Br. Add. 32).

At Step 3, EPA ranks the remaining control alternatives from most to least effective. *Id.*

At Step 4, EPA reviews the "energy, environmental, and economic impacts" of each remaining control alternative, and eliminates any alternatives deemed inappropriate based on these impacts. *Id.* at B.8 (EPA Br. Add. 33). EPA has said that "both beneficial and adverse impacts should be discussed" but that they need be "quantified" only "where possible." *Id.* at B.26 (EPA Br. Add. 51).

Finally, at Step 5, EPA selects as BACT the most effective control alternative not eliminated at Step 4. *Id.* at B.9 (EPA Br. Add. 34).

### 2. *BACT as applied to biomass*

EPA has recognized that emissions of greenhouse gases—and in particular, carbon dioxide ("$CO_2$")—from combustion of biomass, such as the lumber byproducts at issue in this case, raise unique issues that affect the BACT determination. Thus, in 2011, EPA provided *Guidance for Determining Best Available Control Technology for Reducing Carbon Dioxide Emissions from Bioenergy Production* (March 2011) ("Bioenergy BACT Guidance") (PER610-644). EPA explained that while final BACT determinations "can only be made by individual permitting authorities on a case-by-case basis," the analysis set forth in the Bioenergy BACT Guidance "will be sufficient in most cases to support the

conclusion that utilization of biomass fuel alone is BACT for a bioenergy facility." PER616.

As the Bioenergy BACT Guidance explained, "$CO_2$ emissions from bioenergy merit unique consideration in the BACT analysis because land-based biomass carbon stocks can be replenished more quickly than fossil fuel carbon stocks." PER617. In a process called "sequestration," plants absorb carbon dioxide from the atmosphere and store it in their biomass. PER617. When plant biomass is burned, its stored carbon is released back into the atmosphere as carbon dioxide. PER617. If more carbon is sequestered in plant biomass than is emitted into the atmosphere through combusting plant materials, then the plant biomass acts as a net "sink" for carbon. PER617. This process can occur over a matter of decades for plant biomass—as opposed to millennia for fossil fuels. PER617. Indeed, over the 1990-2008 period, the forestry sector in the United States (of which Sierra Pacific is a part) has been a net sink of carbon-dioxide equivalent per year, and this trend is expected to continue through at least 2020. PER618.

EPA explained that the unique nature of biogenic fuels may result in changes at Steps 1 and 4 of the top-down BACT analysis. As noted above, EPA has long recognized that "a Step 1 list of options need not necessarily include inherently lower polluting processes that would fundamentally redefine the nature of the source proposed by the permit applicant." PER623. Thus, "where a

9

proposed bioenergy facility can demonstrate that utilizing a particular type of

biogenic fuel is fundamental to the primary purpose of the project, then at the first

step of the top-down process, permitting authorities can rely on that to determine

that use of another fuel would redefine the proposed source." PER626. "To the

extent this showing is made by a permit applicant proposing to construct or modify

an electric generating facility that would utilize biomass fuels alone in the primary

production process, the options listed as Step 1 of a top-down BACT analysis for

GHGs may be limited to (1) utilization of biomass fuel alone, (2) energy efficiency

improvements, and (3) carbon capture and sequestration if the source meets

[certain] characteristics . . . ." PER626.

In the Bioenergy BACT Guidance, EPA also noted that at Step 4, the

permitting authority considers whether the energy, environmental, or economic

impacts identified for the options remaining on the list would exclude any of those

options. PER628, 631. Because of unique attributes of bioenergy emissions, EPA

explained how the energy, environmental, and economic impacts can be evaluated.

In particular, with respect to the environmental impacts of bioenergy emissions,

EPA determined that a permit applicant may rely on carbon sequestration that

occurs through plant biomass growth. PER631-632. "[G]iven its traditional focus

on 'collateral' environmental impacts and benefits, Step 4 of the BACT analysis

seems well-suited to enable permitting authorities to consider the potential

sequestration of carbon in biogenic resources outside the boundaries of the facility when evaluating BACT for greenhouse gases." PER632.

Concurrent with the release of the Bioenergy BACT Guidance, EPA promulgated the "Deferral Rule," deferring application of PSD permitting requirements to biogenic carbon-dioxide emissions for a three-year period, until July 21, 2014. PER615. EPA adopted the Deferral Rule to give it time to study the science related to the use of biomass fuels and the impact of the carbon cycle on net carbon-dioxide contributions from combustion of biomass.

## B. Factual And Procedural Background

### 1. Sierra Pacific's PSD permit application

In March 2010, Sierra Pacific submitted an application to EPA under the PSD provisions of the Clean Air Act to construct a 31-megawatt biomass boiler and turbine cogeneration unit at its existing facility in Anderson, California. PER471, 744. The proposed new cogeneration unit would burn clean cellulosic biomass in a boiler to produce steam that would (1) be used to dry lumber in existing kilns for the lumber operation and (2) feed a steam turbine to generate electricity. PER471-472, 750. The electricity produced by the steam turbine generator would power on-site equipment, with the remainder to be sold to a public utility as electricity. PER472, 750.

During normal operation, only wood fuel would be combusted in the boiler. PER743. The boiler was expected to operate in this normal capacity as near to continuously as is practicable. PER751. Natural gas would be used only during startup and shutdown, as well as during upset conditions caused by variability in the wood fuel (e.g., wet fuel). PER743.

### 2. *Issuance of PSD permit*

On September 13, 2012, EPA issued a Proposed PSD Permit for the facility, along with a detailed Statement of Basis and Ambient Air Quality Impact Report outlining the BACT analysis and proposed emission limits for the facility. PER463-536. Because the Deferral Rule was in effect at that time, the proposed permit did not include BACT emission limits for greenhouse gases. But EPA proposed emission limits for other pollutants: oxides of nitrogen ($NO_x$), carbon monoxide (CO), and particulate matter (PM, $PM_{10}$, and $PM_{2.5}$). PER478-479. Consistent with Sierra Pacific's application, EPA proposed that add-on control technologies be used for oxides of nitrogen and for particulate matter and that inherently lower-emitting controls be used for carbon monoxide. PER484, 486-487, 489-490.

EPA also proposed that clean cellulosic biomass be the only fuel allowed for use except during startup and shutdown and to counteract upset conditions. PER529. Under the proposed permit, natural gas could be used for startup,

12

shutdown, and upset conditions, but natural gas could not exceed 10% of the total fuel used by the boiler.  PER526, 529.

EPA issued the permit on February 19, 2013, after considering public comments.  PER432.  Consistent with the Deferral Rule in place at that time, the permit did not include a BACT emission limit for greenhouse gases.

### 3. *Petitions for review before the Environmental Appeals Board*

Several individuals filed petitions for review of the permit with EPA's Environmental Appeals Board ("EAB").  PER366-376.   The EAB remanded on one issue, directing EPA to conduct a public hearing because a "significant degree of public interest" existed in the PSD Permit.  *See* PER43-55, 74.   The EAB denied review of the PSD Permit in all other respects.

In particular, the EAB rejected contentions that EPA should have (1) considered a solar energy component for the project as part of the BACT analysis and (2) evaluated a different fuel mix for normal operations that would have relied more heavily on natural gas (and exceeded the 10% cap in the permit).  PER67-68.   The EAB explained that there was "no basis for a remand on these issues [because] the record as a whole makes clear that Sierra Pacific's 'purpose' in proposing this project is to put to use the hundreds of thousands of bone-dry tons of wood waste the lumber company has in the Shasta County region"  PER68.  EPA found that putting this waste biomass to productive use was an "inherent

13

aspect" of the project. PER68. Thus, "requiring Sierra Pacific to burn fewer tons of wood waste so that it could generate solar power or burn more natural gas instead would plainly disrupt the project's 'basic business purpose.'" PER69.

Specifically, the EAB observed that use of solar power "would play absolutely no role in putting to beneficial use Sierra Pacific's millions of tons of wood waste." PER69. And although Sierra Pacific's proposal included the use of natural gas for limited purposes—i.e., "to increase combustion temperatures in a controlled fashion and to stabilize the boiler flame during transitional periods"— natural gas was included only because its use for those purposes is superior to biomass. PER71. The EAB therefore found that this limited use of natural gas was consistent with Sierra Pacific's stated goal "to use as much of its waste biomass fuel as possible." PER70. The EAB thus concluded that "requiring Sierra Pacific to reduce its surplus biomass fuel so that it could increase its natural gas fuel would impermissibly redefine this proposed source." PER71.

EAB declined to reach the merits of a challenge based on EPA's reliance on the Deferral Rule, in light of a decision from the Court of Appeals for the District of Columbia Circuit vacating the Deferral Rule. PER73; *see Ctr. for Biological Diversity v. EPA*, 722 F.3d 401 (D.C. Cir. 2013).

### 4.     *Remand proceedings*

On August 6 and August 15, 2013, Sierra Pacific submitted additional

materials to allow EPA to consider biogenic greenhouse gas emissions and to

include greenhouse gas emission limits and related requirements in the revised

PSD permit.  *E.g.*, PER326-365.

### 5.     *Issuance of modified proposed PSD permit*

On November 7, 2013, EPA issued a modified Proposed PSD Permit

addressing greenhouse gas emission limits and related requirements, along with a

detailed Supplemental Statement of Basis and Ambient Air Quality Impact Report

for Greenhouse Gas Emissions.  PER284-325.  This document contained EPA's

proposed top-down, five-step BACT analysis for greenhouse-gas emissions from

the proposed new facility.  PER307-317.

**Step 1.**  EPA determined that Sierra Pacific's proposed facility would emit

three distinct greenhouse gases:  carbon dioxide, methane, and nitrous oxide.

PER297.  For each of those greenhouse gases, EPA at Step 1 of the BACT analysis

described options for controlling those pollutants.[1]  For carbon dioxide, EPA

identified four possible control techniques:  (1) "carbon capture and sequestration,"

---

[1] As explained in the Government's answering brief, EPA Br. 30, the control
options other than those presented for carbon dioxide, including activated carbon
adsorption systems, thermal and catalytic destruction, and non-selective catalytic
reduction (NSCR), are not raised in or relevant to Center's or Helping Hand's
petitions for review, and therefore are not discussed further in this brief.

(2) "good boiler design, good combustion practices, and efficient operation," (3) "utilization of biomass fuel alone," and (4) "boiler design alternatives."  PER307.

***Step 2.***  At Step 2, EPA considered the technical feasibility of each of the four carbon dioxide control techniques.  First, it considered boiler design alternatives, which had been used at two biomass-fired cogeneration projects elsewhere in the United States.  Based on differences between the operational setup of Sierra Pacific's proposed facility and these two other projects, EPA determined that boiler design alternatives would not be technically feasible for Sierra Pacific's proposed facility.  PER307-309.

Next, EPA considered the technical feasibility of combustion of biomass fuels, either alone or in combination with other fuels, to generate steam in boilers.  EPA determined that this control technique would be technically feasible.  PER309.

Then, EPA considered the technical feasibility of "good boiler design, good combustion practices, and efficient operation."  More specifically, EPA considered whether it would be technically feasible to alter the combustion process to reduce carbon dioxide emissions, and to maximize heat transfer efficiency of the boiler and the mechanical efficiency of the steam turbine and generator.  The latter actions minimize fuel combustion and correspondingly limit carbon dioxide

generated per unit of steam or electricity. EPA determined that doing so would be technically feasible. PER309.

Finally, EPA considered whether carbon capture and sequestration would be technically feasible. Carbon capture and sequestration can be performed either pre-combustion, post-combustion, or as oxy-combustion (using high-purity oxygen rather than air). EPA determined that pre-combustion carbon capture and sequestration and oxy-combustion were not technically feasible because they would redefine the fuel source and would require use of coal, respectively. Accordingly, EPA concluded that only post-combustion carbon capture and sequestration would be technically feasible. PER309.

As a result of its Step 2 analysis, EPA found that the technically feasible control techniques were (1) post-combustion carbon capture and sequestration, (2) "good boiler design, good combustion practices, and efficient operation," and (3) combustion of biomass fuels, either alone or in combination with other fuels such as natural gas.

***Step 3***.  At Step 3, EPA created a control technique combining "good boiler design, good combustion practices, and efficient operation" and combustion primarily of biomass fuel during operation, with combustion of natural gas during startup, shutdown, and flame stabilization periods. PER314. EPA referred to the combined control technique as the "baseline from which all other alternatives will

17

be evaluated," given that "SPI proposed to operate the proposed project in a manner that minimizes emissions of all pollutants, and maximizes the energy derived from the fuel consumed." PER314.

As a point of comparison, EPA included a chart of BACT determinations for five similar biomass boilers, and these BACT determinations were ultimately similar to the combined, baseline control technique of good design, good combustion, efficient operation, and combustion of biomass fuels. PER315.

EPA's Step 3 analysis also ranked the other remaining potential carbon dioxide emissions-reducing control option—i.e., post-combustion carbon capture and sequestration—as the most effective, technically feasible control option for further study at Step 4. PER314.

**Step 4.** At Step 4, EPA considered the economic, environmental, and energy impacts for the remaining control techniques. As discussed above, only two carbon dioxide control techniques remained at Step 4. The first, post-combustion carbon capture and sequestration, was eliminated for disproportionate costs: not only would compressing captured carbon dioxide increase the boiler's energy footprint and emissions by 40% to 60%, but transporting the captured carbon dioxide would also require construction of a pipeline costing more than $100 million, in addition to the approximately $30 million cost for installing a carbon capture and sequestration system. PER315-316.

18

EPA determined that the second combined technique—good design, good combustion, efficient operation, and combustion of biomass fuels—would have "positive energy and environmental impacts," and this control technique was left as the only remaining BACT option at the end of Step 4.  PER316-317.

*Step 5.*  At Step 5, EPA selected the combined control technique as BACT. PER317.  In addition, EPA provided specific detail on the precise nature of this emissions limitation method, including (1) a limit on carbon-dioxide-equivalent emissions per pound of steam; (2) combustion of biomass at all times other than startup, shutdown, and flame stabilization, during which natural gas can be combusted; and (3) energy-efficient design and use of good combustion, operational, and maintenance practices as detailed in Sierra Pacific's permit application and subsequent submittals.  PER317.

### 6.    *EPA's revisions in response to public comments*

In 2014, EPA revised and supplemented its BACT analysis in light of comments submitted in response to the modified Proposed PSD permit, including comments from petitioner Center for Biological Diversity.  In response to the Center's argument that the use of biomass alone should not be listed as an option in Step 1, EPA explained that its purpose in listing biomass at Step 1 was "to inform the public that [EPA was] not considering other fuel types to be potential control options for this facility and that biomass fuel was the only fuel option that would

be subject to further examination in subsequent steps." PER128. Biomass fuel was included because that was the design that Sierra Pacific had proposed, and including it at Step 1 would allow EPA to evaluate "whether the design can be improved or controls can be added to reduce emissions from that baseline." PER130.

In response to the Center's comment, however, and recognizing that biomass forms vary in their lifecycle emissions, EPA restricted the forms of biomass included in Step 1, thus limiting the types of biomass that Sierra Pacific will be permitted to combust at its facility. PER134. In particular, EPA limited Sierra Pacific's combustion of biomass to specific fuels that the Center agreed would have a lower net emission of greenhouse gases: mill residues, untreated pallets and crates, agricultural crops and residues, forest residues, and non-merchantable forest biomass. PER134. EPA thereby precluded Sierra Pacific from using timber harvested solely for purposes of biomass combustion. PER134.

The final permit decision by EPA therefore defines BACT as (1) combustion of specific biomass feedstocks, as limited by the above-mentioned permit condition; (2) energy-efficient design, operation and maintenance; and (3) operation as a cogeneration unit. PER134.

### 7.  *Further appeals to the EAB dismissed*

A number of parties filed additional administrative appeals to the EAB following EPA's issuance of the final PSD Permit, notwithstanding the EAB's earlier instruction that it was "not requiring, and will not accept, an appeal to the Board on the final permit decision following remand in this case."  PER74.  On June 5, 2014, the EAB issued an order dismissing these appeals for lack of jurisdiction, based on its prior statements that the final PSD Permit would become final agency action subject to judicial review.  PER3-5.

## SUMMARY OF ARGUMENT

I.    The BACT requirements that EPA imposed are reasonable and consistent with the Clean Air Act and EPA's own regulations and guidance.  EPA performed the five-step, top-down BACT analysis set forth in its guidance.  It began with four potential control techniques and then, through a series of steps, narrowed down the options to one that involved a combination of (1) combustion of specific biomass feedstocks; (2) energy-efficient design, operation and maintenance; and (3) operation as a cogeneration unit.  EPA carefully considered the relevant factors and articulated a rational connection between the facts it found and the BACT determination it made, and its determination was neither arbitrary nor capricious.

None of the Center's challenges to EPA's BACT determination has merit. Contrary to the Center's suggestion, EPA did not adopt as BACT the combustion of "biomass alone." EPA specified in detail what particular biomass feedstocks Sierra Pacific could combust at the facility: "mill residues; untreated wood debris from urban areas (e.g., pallets and crates); agricultural crops and residues; forest residues; and non-merchantable forest biomass." PER134. EPA prohibited Sierra Pacific from using "timber harvested solely for the purpose of biomass combustion." PER134. Those requirements are actually consistent with what the Center asked EPA to impose. Ignoring what EPA actually required in the final permit, the Center focuses on EPA's inclusion of "biomass alone" at Step 1 of its BACT analysis. But that did not violate the statute, which does not require EPA's five-step BACT approach, much less dictate what must take place at each step. As EPA explained, there is nothing improper about including a baseline option at Step 1 for comparison and public-notice purposes. In any event, what matters is what EPA ultimately required, which was not "biomass alone."

The Center also contends that EPA violated the Clean Air Act "by failing to consider whether *some* of the biomass fuels proposed for use at the facility might be 'clean fuels' when compared with other forms of biomass on a 'net' or life cycle emissions basis." Center Br. 45. The Center argues that EPA should have made different decisions at each step of EPA's five-step BACT analysis. But, again, no

22

such requirement exists in the statute. EPA's ultimate determination was based on its consideration of all of the required factors, and it was fully compliant with the Clean Air Act's actual requirements. Indeed, EPA in substance followed the very approach urged by the Center, as it required Sierra Pacific to use only certain feedstocks that the Center itself has argued produce lower net carbon emissions.

II. EPA reasonably concluded that requiring Sierra Pacific to burn natural gas during normal operations or implement solar energy would impermissibly redefine the project rather than be a control technology on the proposed project. As the Supreme Court has stated, it is well-established that the BACT requirement cannot be used to order a fundamental redesign of the facility. *Utility Air*, 134 S. Ct. at 2448. Here, it is a fundamental design and purpose of the facility to use Sierra Pacific's surplus wood waste as fuel in the proposed boiler, to generate steam and electricity. EPA reasonably determined that requiring use of natural gas or solar during normal operations would be inconsistent with the basic business purposes of the facility.

Helping Hand's arguments to the contrary are misplaced. First, EPA did not read "clean fuels" out of the statutory definition of BACT. Rather, EPA determined that natural gas and solar could not be BACT because they would not be control technologies. It is Helping Hand's argument that stretches the definition of "control technology" beyond its limit.

23

Second, Helping Hand mischaracterizes Sierra Pacific's basic business purpose, contending it is to generate steam and electricity, not to burn biomass. But EPA gave Sierra Pacific's stated business purpose a "hard look," and the record amply supports its determination that the particular fuel source is inherent in and fundamental to the design of the project. Sierra Pacific is seeking to put to beneficial use wood waste that is produced as a byproduct of its lumber business, more than enough of which is available to fuel the boiler during normal operations.

Third, contrary to Helping Hand's suggestion, there is nothing improper about the 10% cap on natural-gas use that is imposed in the permit. The proposed facility will use a minimal amount of natural gas in limited circumstances: startup, shutdown, and for fuel stabilization. Sierra Pacific agreed to a federally enforceable 10% cap on natural-gas use, which allowed it to be exempt from other permitting requirements with respect to the natural-gas use. EPA did not allow this 10% cap to trump the BACT requirements. Rather, EPA reviewed the 10% cap and determined that Sierra Pacific did not impose this limit for air-quality-permitting purposes. That conclusion is correct, as the proposed boiler is expected to burn far less natural gas than the 10% cap would allow. The cap is therefore incidental to the proposed design.

Finally, Helping Hand argues that EPA should have considered solar energy as BACT for natural-gas use. But Helping Hand never made this argument to the

24

EAB, and it is therefore waived.  In any event, if accepted, such a requirement

would improperly redefine the project, and EPA therefore did not err in not

considering solar energy as a BACT option for natural gas.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, final agency actions, findings, and

conclusions may be set aside only if they are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under

this highly deferential standard, the Court need only conclude that EPA

"considered the relevant factors and articulated a rational connection between the

facts found and the choice made."  *Nat'l Ass'n of Home Builders v. Norton*, 340

F.3d 835, 841 (9th Cir. 2003).  The Court's review "is based on the administrative

record and the basis for the agency's decision must come from the record."  *Id.*

The Court "cannot substitute [its] judgment for that of the agency."  *Id.*  Moreover,

"[w]here scientific and technical expertise is necessarily involved in agency

decision-making,  .  .  .  a reviewing court must be highly deferential to the

judgment of the agency."  *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384

F.3d 1163, 1174 (9th Cir. 2004).

EPA's interpretation and application of the Clean Air Act is entitled to

*Chevron* deference.  *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984).

At Step 1 of the *Chevron* test, the Court determines "whether Congress has directly

spoken to the precise question at issue," and if so, the Court's inquiry is complete. *Id.* at 842. If Congress has not clearly addressed the precise question at issue, as it has not here, the Court must determine whether EPA has taken action "based on a permissible construction of the statute." *Id.* at 843. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844.

## ARGUMENT

## I. EPA'S BACT ANALYSIS SATISFIES THE CLEAN AIR ACT'S REQUIREMENTS

The BACT requirements imposed by EPA in its final permit decision were fully consistent with the Clean Air Act's requirements. EPA imposed specific emissions-control requirements on Sierra Pacific and specified that it use biomass feedstocks that the Center itself had identified as preferable. The Center's criticisms of EPA's approach are based on a fundamental misunderstanding of EPA's actual decision in this case and on wholly invented statutory requirements. The Center's petition should be denied.

### A. EPA Articulated A Rational Explanation Of Its BACT Analysis

As noted above, BACT is an emission limitation based on the maximum degree of pollutant reduction that EPA or the state permitting authority, "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs," determines that the facility can achieve "through application of

26

production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant." 42 U.S.C. § 7479(3).

The Clean Air Act contains no further instructions on how EPA is to conduct a BACT analysis, leaving the methodology entirely up to the agency. In exercising that broad delegated authority, EPA has periodically issued guidance documents to assist those charged with implementing the PSD program in their BACT determinations. *See supra* pp. 6-11. Although EPA's guidance documents do not contain binding rules, *see supra* p. 6, EPA's BACT analysis in this case was entirely consistent with its longstanding approach as articulated in the documents.

EPA's BACT analysis is discussed in detail above, *see supra* pp. 15-20, and summarized in relevant part here. At Step 1 of its BACT analysis, EPA identified four possible control techniques for Sierra Pacific's proposed facility: (1) "carbon capture and sequestration," (2) "good boiler design, good combustion practices, and efficient operation," (3) "utilization of biomass fuel alone," and (4) "boiler design alternatives." PER307. As EPA explained, its inclusion of "biomass fuel alone" in Step 1 was entirely consistent with its Bioenergy BACT Guidance and performed an important public-notice role. PER128. EPA explained that, "as defined by the permit applicant, the use of biomass fuel is a design element of the proposed facility that is inherent to the applicant's purpose for building the

27

cogeneration facility." PER128. EPA therefore included "biomass fuel alone" at Step 1 "to inform the public that [it was] not considering other fuel types to be potential control options for this facility and that biomass fuel was the only fuel option that would be subject to further examination in subsequent steps of the top-down process." PER128.

At Step 2, EPA determined that boiler design alternatives and pre-combustion carbon capture and sequestration would not be technically feasible and eliminated those options. PER308-09. That left as technically feasible control techniques: (1) post-combustion carbon capture and sequestration, (2) "good boiler design, good combustion practices, and efficient operation," and (3) combustion of biomass fuels.

At Step 3, EPA created a combined control technique reflecting both Sierra Pacific's proposal to apply "good boiler design, good combustion practices, and efficient operation," and its proposal to combust primarily biomass fuel during operation, with combustion of natural gas only during startup, shutdown, and flame stabilization periods. PER314. At the same time, the Step 3 analysis ranked post-combustion carbon capture and sequestration as the most effective, technically feasible control option for further study at Step 4. PER314.

At Step 4, EPA eliminated post-combustion carbon capture and sequestration as disproportionately expensive. PER315-316. EPA determined that

the remaining technique—good design, good combustion, efficient operation, and combustion of biomass fuels—would have "positive energy and environmental impacts." PER316-317.

At Step 5, EPA selected the combined control technique as BACT for Sierra Pacific's facility. PER317.

In response to comments submitted by the Center, EPA subsequently imposed further restrictions on Sierra Pacific's permit. In particular, EPA limited Sierra Pacific's combustion of biomass to specific fuels that the Center agreed would have a lower net emission of greenhouse gases: mill residues, untreated pallets and crates, agricultural crops and residues, forest residues, and non-merchantable forest biomass. PER134. EPA thereby precluded Sierra Pacific from using "timber harvested solely for purposes of biomass combustion." PER134.

The final permit by EPA therefore defines BACT as (1) combustion of specific biomass feedstocks, as limited by the above-mentioned permit condition; (2) energy-efficient design, operation and maintenance; and (3) operation as a cogeneration unit. PER134.

EPA carefully considered the relevant factors in the BACT analysis and articulated a rational connection between the facts it found and the BACT determination it made. EPA's selection of the combined control technique of good

design, good combustion, efficient operation, and combustion of specific biomass fuels was neither arbitrary nor capricious.

**B.   The Center's Challenges To EPA's BACT Determination Are Meritless**

None of the Center's challenges to EPA's BACT determination has merit. The Center's arguments ignore EPA's actual permitting decision and rest on non-existent statutory requirements.

*1.   The Center's challenge to identification of biomass combustion at Step 1 of the BACT analysis is misplaced*

The Center's principal argument is that EPA erred when it "proposed, and ultimately adopted, burning biomass fuel as BACT for the emissions caused by burning biomass fuel."  Center Br. 25.  "Because merely burning a fuel does nothing to 'control,' 'limit,' or 'reduce' the emissions caused by burning that same fuel," the Center's argument continues, "EPA's BACT determination here contravenes the plain text of the Clean Air Act and must be set aside."  *Id.* at 25-26.

The Center's entire argument is based on a false premise.  EPA did *not* "ultimately adopt[]" as BACT the combustion of "biomass alone."  As discussed above, the final permit by EPA defines BACT as combustion of specific biomass feedstocks (not biomass generally); energy-efficient design, operation and maintenance; and operation as a cogeneration unit.  PER134.  The Center is

30

therefore fundamentally mistaken when it suggests that the BACT ultimately selected by EPA did nothing to "control," "limit," or "reduce" emissions from Sierra Pacific's facility as compared to an uncontrolled alternative. Center Br. 25-26.

First, the permit required Sierra Pacific to use energy-efficient design, operation, and maintenance in order to control, limit, and reduce emissions. PER198-201. The fact that Sierra Pacific itself included such control measures in its permit application does not mean that they do not exist. Indeed, to adopt a rule in which control measures proposed by the applicant do not count for purposes of a BACT analysis would perversely encourage applicants to propose no controls at all, leaving their imposition entirely up to EPA. Moreover, there is a fundamental difference between an applicant's mere plan to operate its facility using such control measures and a permit condition making such measures a legally enforceable condition of its ability to operate. EPA's incorporation of Sierra Pacific's proposed control measures into the permit thus has real significance.

Second, far from authorizing Sierra Pacific to combust "biomass alone," EPA specified in detail what particular feedstocks Sierra Pacific could use at the facility. In comments filed with EPA, the Center had noted that "[b]iomass fuels may differ . . . in their life cycle greenhouse gas emissions—or, more accurately, in the relative period of time during which biomass combustion results in increased

atmospheric $CO_2$ concentrations (the so-called 'carbon debt' period)." PER232. The Center contrasted "[c]ombustion of whole trees," which it argued results in "carbon debt periods ranging from decades to centuries," with combustion of mill waste, which the Center noted might have a "relatively short" carbon debt if it "otherwise would be stored or disposed of in a manner likely to generate equivalent or greater short-term greenhouse gas emissions." PER232-234.[2]

In specific response to the Center's argument, EPA imposed detailed restrictions on the fuel mix that Sierra Pacific could use. In particular, EPA mandated that Sierra Pacific could use only "mill residues; untreated wood debris from urban areas (e.g., pallets and crates); agricultural crops and residues; forest residues; and non-merchantable forest biomass." PER134. Conversely, EPA prohibited Sierra Pacific from using "timber harvested solely for the purpose of biomass combustion." PER134. EPA explained that these requirements would "limit the facility to the types of biomass fuels that are generally considered to have lower net atmospheric contributions when combusted." PER134.

The Center's arguments elide the fact that the final agency action subject to review in this Court is EPA's final permit issued to Sierra Pacific. PER1-2;

---

[2] The Center posited that if mill waste were "crafted into durable wood products, the carbon debt associated with production could be longer." PER234. EPA in this case, however, accepted Sierra Pacific's explanation "that there is no market for its mill waste due to the closure of several former facilities that previously manufactured particle board, oriented strand board and pulp and paper." PER134.

PER195-215.  That permit embodies EPA's imposition of the "best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility."  42 U.S.C. § 7475(a)(4).  To demonstrate that EPA violated "the plain text and purpose of the Clean Air Act," Center Br. 29, the Center must demonstrate how that final agency action contradicted the statute.  The Center fails entirely to do so.  Even assuming *arguendo* that the Center were correct that combustion of "biomass alone" would not constitute a permissible "control option" under the BACT provisions of the statute, Center Br. 31, that would be beside the point.  EPA did not select "biomass alone" as BACT in this case.

The Center nonetheless argues at length about the propriety of EPA's inclusion of "biomass alone" at Step 1 of its BACT analysis.  Center Br. 29-45.  But the statute does not require EPA's five-step, "top-down" approach, much less specify what must occur at any of the five steps.  Accordingly, EPA's methodological decision to include, or not to include, an option at Step 1 of its own internal BACT analysis cannot have "violated" the Clean Air Act.  More specifically, nothing in the statute prohibited EPA from including a baseline option (or a "no control" option, as the Center characterizes "biomass alone") in Step 1 of its BACT analysis in order to have a point of comparison to other options and to

put the public on notice that other fuel options (which would alter the purpose of the project) would not be considered.

In any event, EPA's inclusion of "biomass alone" at Step 1 of its BACT analysis was entirely reasonable. As EPA explains in detail, including a baseline option in the BACT analysis "is inherent in the top-down process regardless of whether a baseline option is listed at Step 1." EPA Br. 77-81. Indeed, such a baseline option provides a critical point of comparison for other control options, both in terms of emissions reduction and cost effectiveness. *See id.* Likewise, nothing in the Act prohibits EPA from selecting the baseline option as BACT in the event it determines that no emissions reduction below that option is realistically "achievable." 42 U.S.C. § 7479(3); *see* EPA Br. 81-82.

But the fundamental point here remains that EPA ultimately *did not choose* the baseline option of "biomass alone" as BACT. It instead required use of specific biomass feedstocks that the Center itself advocated as producing lower net carbon contributions and also required energy efficient design, operation, and maintenance of Sierra Pacific's cogeneration unit. The Center therefore attacks a phantom BACT determination that EPA did not adopt.

34

### 2. EPA's specification that Sierra Pacific could combust only certain feedstock did not violate the "clean fuels" portion of the statute

The Center also contends that EPA violated the Clean Air Act "by failing to consider whether *some* of the biomass fuels proposed for use at the facility might be 'clean fuels' when compared with other forms of biomass on a 'net' or life cycle emissions basis." Center Br. 45 (quoting 42 U.S.C. § 7479(3)). Like the Center's other arguments, this contention is based on invented requirements not present in the Clean Air Act and disregards what EPA actually did in granting Sierra Pacific's permit.

As relevant to this portion of the Center's argument, the Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation" that EPA or the state permitting authority "determines is achievable for such facility through application of," among other things, "techniques, including . . . clean fuels." 42 U.S.C. § 7479(3). To determine whether an emission limitation is achievable (and therefore may be BACT), review is performed "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." *Id.*

The Center reads into these open-ended and general provisions an elaborate and detailed set of requirements regarding "clean fuels" and then faults EPA for not complying with them. According to the Center, EPA was required to make a

finding concerning "whether it has statutory authority to consider the 'net' $CO_2$ emissions associated with growth and combustion of different biomass fuels in the BACT context," Center Br. 47, then list "particular forms of biomass" separately at BACT Step 1, *id.* at 51, then "ascertain which fuels were technically feasible to use at Step 2," *id.* at 59, then "rank the feedstocks relative to one another in terms of their general atmospheric consequences (and thus their rough control effectiveness relative to one another) at Step 3," *id.*, then "evaluate the relative non-air quality environmental, economic, and energy effects of each feedstock at Step 4," *id.*, and finally "choose the most effective fuel source at Step 5," *id.* EPA's failure to follow this detailed roadmap, according to the Center, violated "a clear statutory requirement." *Id.*

There simply is no such statutory requirement. The Clean Air Act does not mandate a five-step top-down analysis, much less specify what must occur at any given step. Instead, the statute merely requires EPA to consider the maximum degree of emissions reduction that is achievable through use of, among other things, "clean fuels" and to take into account a variety of factors, including "environmental . . . impacts." 42 U.S.C. § 7479(3). EPA fully complied with that provision.

As the Center itself acknowledged during the administrative proceedings, "combustion of different forms of biomass will produce roughly the same amount

of $CO_2$ at the stack; stack emissions therefore offer little or no basis for identifying whether particular forms of biomass are 'inherently lower-emitting.'"  PER232. As the Center also stated, "[b]iomass fuels may differ, however, in their life cycle greenhouse gas emissions—or, more accurately, in the relative period of time during which biomass combustion results in increased atmospheric $CO_2$ concentrations (the so-called 'carbon debt' period)."  PER232.  EPA expressly took into account those "environmental . . . impacts"  (42 U.S.C. § 7479(3)),  i.e., the relative net atmospheric contributions of different biomass feedstocks.  In its final permitting decision, EPA therefore "limited" Sierra Pacific to use of types of biomass "that are generally considered to have lower net atmospheric contributions when combusted."  PER134.  The Center faults EPA for supposedly "forgo[ing] an analysis of whether some forms of biomass proposed for use as fuels in Sierra Pacific's facility might be 'cleaner' than others, in terms of relative 'net' $CO_2$ emissions," Center Br. 51, but the agency did just that.  *See* PER134.

In the Center's view, EPA should have listed various biomass feedstocks at Step 1 of its BACT analysis and then should have conducted a "quantitative" assessment of their net atmospheric contributions at Step 3.  Center Br. 52-53.  The statute includes no such requirements.  Nor does EPA's (non-statutory) guidance. As EPA explains, the agency "has traditionally ranked options based on *direct emissions* at Step 3."  EPA Br. 93.  Yet, here, different types of biomass feedstock

do not produce different levels of emissions. PER232. It is Step 4 where EPA has long "considered *indirect* environmental impacts," EPA Br. 94, and the agency thus acted consistently with its past practice when it weighed the relative net atmospheric contributions of different biomass feedstocks at that part of its BACT analysis.

\* \* \* \* \*

The Center's arguments rest on a comparison between a decision EPA did not make and statutory requirements that do not exist. EPA's actual decision was fully compliant with the Clean Air Act's actual requirements. The Center's petition should be denied.

## II. EPA REASONABLY EXERCISED ITS DISCRETION IN DETERMINING THAT THE PROPOSED FACILITY NEED NOT USE FUELS OTHER THAN BIOMASS DURING NORMAL OPERATIONS

EPA considered but correctly rejected Helping Hand's argument that EPA should have included natural gas and/or solar power as fuels for the proposed project in the BACT analysis. As EPA reasonably concluded, forcing Sierra Pacific to use fuels other than biomass to operate the proposed boiler during normal operations would fundamentally redefine the proposed project, and therefore those options need not be considered in the BACT analysis. Helping Hand's petition should be denied.

**A.    EPA Reasonably Concluded That Requiring Sierra Pacific To Use Fuels Other Than Biomass During Normal Operations Would Fundamentally Redefine The Proposed Facility**

The Clean Air Act's BACT requirement applies only to the facility that the permit applicant proposes, not to a hypothetical facility that could be constructed in theory but that the applicant does not intend to build.  Specifically, the Clean Air Act requires that "the *proposed facility* [be] subject to the best available control technology for each pollutant subject to regulation . . . emitted from, or which results from, *such facility*."  42 U.S.C. § 7475(a)(4) (emphases added).  Because of this express statutory limitation, EPA distinguishes between (1) "'control technology' as a means of reducing emissions from a power plant or other source of pollution," and (2) "redesigning the 'proposed facility' (the plant or other source)—changing its 'fundamental scope.'"  *Sierra Club*, 499 F.3d at 655.  EPA has interpreted Section 7475(a)(4) such that it can require the permit applicant to implement control technology but not fundamental redesigns.  Thus, only the former is included in EPA's BACT analysis.

Accordingly, EPA "takes care to identify 'inherent' design elements, part of the 'fundamental purpose' of the proposed facility, or a design such that change to it would call into question the [facility's] existence."  *In re N. Mich. Univ. Ripley Heating Plant*, PSD Appeal No. 08-02, 2009 WL 443976, at \*16 (EAB Feb. 18, 2009) (citations omitted) (alteration in original).  This distinction "shields from

BACT review fuel choices found 'integral' to the basic design." *Id.* For example, if the permit applicant seeks to build a coal-fired power plant, EPA will not consider requiring the applicant to "redesign its plant as a nuclear plant rather than a coal-fired one," or to "replace coal-fired boilers with wind turbines." *Sierra Club*, 499 F.3d at 655; *see N. Mich. Univ.*, 2009 WL 443976, at *16 ("Proposed coal-fired electrical generators need not consider a natural-gas turbine, for example."). As the Seventh Circuit has explained, if such fundamental redesigns were considered control technologies, it "would stretch the term 'control technology' beyond the breaking point." *Sierra Club*, 499 F.3d at 655.

Petitioners do not challenge EPA's decision to exclude fundamental redesigns from the definition of "control technology." Even if they did, EPA's decision to interpret "control technology" in the Clean Air Act as not including such redesigns would be "the kind of judgment by an administrative agency to which a reviewing court should defer." *Id.* Indeed, as the Supreme Court recently recognized, this interpretation is well established: "it has long been held that BACT cannot be used to order a fundamental redesign of the facility." *Utility Air*, 134 S. Ct. at 2448.

EPA has established a reasonable process for determining what alterations to facility design would constitute a redefinition of the source. First, EPA evaluates how a permit applicant defines its "proposed facility's end, object, aim, or

purpose—that is the facility's basic design." *In re Desert Rock Energy Co.*, 14 E.A.D. 484, 530 (EAB 2009), 2009 WL 3126170 at *36. Second, EPA takes a "hard look" at which design elements are inherent to the applicant's purpose and which can be changed to reduce emissions "without disrupting the applicant's basic business purpose for the proposed facility." *Id.* Finally, EPA considers whether the proposed design has been "derived for reasons independent of air quality permitting." *In re City of Palmdale*, PSD Appeal No. 11-07, slip op. at 43 (EAB Sept. 17, 2012). That is, EPA evaluates whether the applicant has "intentionally design[ed] the plant in a way calculated to make measures for limiting the emission of pollutants ineffectual." *Sierra Club*, 499 F.3d at 654.

In reviewing EPA's analysis, it may not be readily apparent to the Court "where control technology ends and a redesign of the 'proposed facility' begins." *Id.* at 655. In cases in which "it is not obvious where to draw that line . . . , it makes sense to let the EPA, the author of the underlying distinction, draw it, within reason." *Id.* The distinction "is one of degree and the treatment of differences of degree . . . is entrusted to the judgment of the agency that administers the regulatory scheme rather than to courts of generalist judges." *Id.* at 656; *see Desert Rock*, 14 E.A.D. at 530 (EPA has "broad discretion" in determining whether a proposed control would fundamentally redefine the source.).

Here, EPA reasonably exercised its discretion in determining that requiring Sierra Pacific to use fuel other than biomass during normal operations would not be a mere control technology on the proposed facility but instead would fundamentally redefine the proposed facility.

First, Sierra Pacific has consistently stated that the central purpose of its proposed project is to use a byproduct of its lumber operations as a fuel that would produce heat and electricity for its lumber operations at its Anderson location. In its permit application, Sierra Pacific stated that the project's purpose was "to construct a new cogeneration unit at the Anderson facility that would burn biomass fuels in a boiler to produce steam that would be used to generate electricity and to heat existing lumber dry kilns at the facility." PER750. Sierra Pacific's Anderson lumber plant produces as a byproduct approximately 160,000 bone dry tons ("BDT") of wood waste per year. PER68. Sierra Pacific wants to put as much of this waste to beneficial use as possible. Approximately 60,000 BDT is currently used to power an existing boiler. PER68. Another 20,000 BDT is currently trucked to other biomass power plants for combustion. PER68. And the remaining 80,000 BDT is trucked to other markets. PER68. The purpose of the proposed new cogeneration unit is to use 80,000 BDT of this wood waste byproduct from the Anderson operation, along with additional wood waste from other facilities in California, for heat and power at the Anderson facility.

Second, EPA gave this stated purpose a "hard look" and correctly concluded that requiring other fuels would disrupt Sierra Pacific's basic business purpose in proposing the new facility. EPA concluded that an "inherent aspect" of the proposed project is to "use biomass from existing Sierra Pacific facilities, as well as in-forest materials and various sources of agricultural and urban wood waste." PER68. With respect to solar power, EPA explained that using that power source would be "a significant departure from the existing facility's operations and the Project's purpose." PER67. The EAB agreed, reasonably concluding that in light of "the record as a whole," the "core of the proposed project" is "to put to use the hundreds of thousands of bone-dry tons of wood waste the lumber company has in the Shasta County region, for the production of lumber and electricity." PER68.

These conclusions are well supported by the record and by reason. Sierra Pacific's lumber operations already produce as waste byproduct more than enough fuel to burn in the proposed cogeneration unit. As the EAB explained, citing evidence in the record, "Sierra Pacific has more surplus biomass at its various facilities than its proposed Anderson boiler can consume on an annual basis." PER68. Requiring solar power or additional natural gas would preclude Sierra Pacific from putting that waste to good use. As the EAB explained, "requiring Sierra Pacific to burn fewer tons of wood waste so that it could generate solar power or burn more natural gas instead would plainly disrupt the project's 'basic

43

business purpose' of using as much surplus biomass as possible to generate steam"

to be used to dry lumber and for electricity.  PER69.  Although use of a different

fuel would be possible, it would not fulfill Sierra Pacific's basic business purpose

because it "would play absolutely no role in putting to beneficial use Sierra

Pacific's millions of tons of wood waste."  PER69.  Thus, "requiring Sierra Pacific

to set aside some of its surplus biomass" in favor of a different fuel "would

impermissibly redefine the source."  PER69.

Third, EPA reasonably concluded that the fact that a limited amount of

natural gas will be used in the proposed facility does not alter the fact that a central

purpose of the facility is to use as much surplus biomass as possible.  Sierra

Pacific's application included use of natural gas for limited, specific purposes:

boiler startup and shutdown and to "counteract upset conditions caused by fuel

variability (e.g., wet fuel)."  PER743.  As the EAB explained, natural gas will be

used in these circumstances only because natural gas is much better suited "to

increase combustion temperatures in a controlled fashion and to stabilize the boiler

flame during transitional periods."  PER71.  In all other circumstances, biomass

"can be burned safely and efficiently during steady-state conditions."  PER71.

Indeed, as Sierra Pacific explained in response to a request for additional

information from EPA, "[d]uring normal operation, only wood fuel will be

combusted in the boiler."  PER743.  Natural gas is expected to be used no more

than 500 hours per year, given that the boiler is expected to be started and shut down as infrequently as possible. PER300; PER589. Accordingly, as the EAB reasonably concluded, such minimal, "prudent" use of natural gas "does not obviate Sierra Pacific's basic goal of using its excess wood waste to produce new wood products and electricity." PER71.

Because increasing the natural-gas component of the fuel mix or requiring solar power would impermissibly redefine the source, EPA was not required to consider it further, as the EAB correctly determined.

### B. Helping Hand's Arguments To The Contrary Are Unfounded

Helping Hand makes several arguments in an attempt to show that EPA's conclusions were not reasonable. None of Helping Hand's arguments has merit.

#### 1. EPA did not "read 'clean fuels' out of the statutory definition" of BACT

Helping Hand contends that by not including solar power or increased natural gas in its BACT analysis, EPA "effectively eviscerated the plain text of the Clean Air Act, which requires consideration of 'clean fuels' as BACT." Helping Hand Br. 30. Helping Hand points to the definition of "best available control technology," which includes "application of production processes and available methods, systems, and techniques, including fuel cleaning, *clean fuels*, or treatment or innovative fuel combustion techniques." 42 U.S.C. § 7479(3) (emphasis added).

45

EPA's conclusion here is entirely consistent with the statutory definition of BACT. EPA did not conclude that clean fuels are not BACT in general. Rather, consistent with its longstanding interpretation of 42 U.S.C. § 7475(a)(4), EPA concluded that requiring the use of natural gas or solar in this particular facility would not be a "control technology" for the proposed facility but rather would redefine the proposed facility. PER67-71; *see supra* Part II.A. Had EPA concluded that requiring use of clean fuels other than biomass during normal operations would not redefine the source, EPA presumably would have included clean fuels in the BACT analysis, consistent with Sections 7475(a)(4) and 7479(3). Far from reading anything out of those provisions, EPA read them together and gave them full effect.

It is Helping Hand's interpretation—that clean fuels must be considered in the BACT analysis, even if their use would fundamentally redesign the project— that "would stretch the term 'control technology' beyond the breaking point." *Sierra Club*, 499 F.3d at 655. Helping Hand's argument, if accepted, would eviscerate the well-established principle that "BACT cannot be used to order a fundamental redesign of the facility." *Utility Air*, 134 S. Ct. at 2448.

Contrary to Helping Hand's suggestions, there are cases (like this one) in which the basic business purpose of a proposed project is tied to a particular fuel source. For example, in *Sierra Club*, the proposed project was a coal-fired power

plant to be situated near the mouth of a coal mine, to burn coal from that mine for power. 499 F.3d at 654. EPA concluded that use of the particular coal from the co-located mine was an inherent aspect of the project. *Id.* at 656-57. To require the plant operator to ship in cleaner, lower-sulfur coal to burn in the facility would require the operator to "redefine the fundamental purpose or basic design of its proposed Facility." *Id.* at 657. So too here: the very purpose of the project is to use biomass waste that already is produced in Sierra Pacific's operations as fuel in the proposed project, and to require use of a different fuel would defeat that purpose.

Helping Hand contends that EPA's conclusion here would allow permit applicants to "avoid consideration of using greater amounts of [a] cleaner fuel simply by declaring that their basic business purpose was to burn the dirtier fuel 'as much as possible.'" Helping Hand Br. 35. Not so. EPA does not simply take the permit applicant's stated purpose of its proposed project at face value. To the contrary, EPA takes a "hard look" at which design elements are inherent to the applicant's purpose and which can be changed to reduce emissions "without disrupting the applicant's basic business purpose for the proposed facility." *Desert Rock*, 14 E.A.D. at 530. At times, EPA does not agree that a particular fuel is inherent to the project's design. *See, e.g.*, *N. Mich. Univ.*, 2009 WL 443976, at *16. Here, EPA carefully analyzed Sierra Pacific's stated purpose, applied EPA's

47

technical expertise, experience, and judgment, and ultimately agreed with Sierra

Pacific that use of biomass is inherent to the proposed boiler's design. PER67-71.

If EPA were not persuaded, or if the facts were different, the BACT analysis also

would have been different.

      EPA's conclusion also is consistent with its guidance. *Contra* Helping Hand

Br. 32. EPA's Bioenergy BACT Guidance states that "where a proposed

bioenergy facility can demonstrate that utilizing a particular type of biogenic fuel

is fundamental to the primary purpose of the project, then at the first step of the

top-down process, permitting authorities can rely on that to determine that use of

another fuel would redefine the proposed source." PER626. In such

circumstances, "the permitting authority need not list and undertake a comparative

evaluation of other fuel types." PER128 (citing PER626).

      Moreover, EPA's New Source Manual explains: "Historically, EPA has not

considered the BACT requirement as a means to redefine the design of the source

when considering available control alternatives." New Source Manual at p. B.13

(EPA Br. Add. 38). Helping Hand ignores that part of the New Source Manual,

which is fatal to its arguments, and instead points to the New Source Manual's

statement that "the ability of design considerations to make the process inherently

less polluting *must be considered* as a control alternative for the source." Helping

Hand Br. 32 (quoting New Source Manual at p. B.14) (emphasis added by Helping

48

Hand).  Consistent with that guidance, EPA in fact did consider and require good boiler design and also considered (but ultimately rejected as infeasible) other design options.  PER308-309.

The EAB's decision in *Northern Michigan University* likewise is unhelpful to Helping Hand.  There, the proposed facility would be a co-fired facility, using a combination of wood, coal, and natural gas.  2009 WL 443976 at *3, *16-17.  On the particular record of that case, the EAB concluded that a different mix of those fuels would not result in any facility design change.  *Id.* at *16.  Here, by contrast, the proposed facility is not co-fired but is designed to burn only biomass during normal operations.

> ### 2. Helping Hand's arguments are based on a mischaracterization of Sierra Pacific's basic business purposes for the proposed facility

Helping Hand argues that "nothing in the Record supports a finding that [Sierra Pacific] actually has th[e] extraordinary 'basic business purpose' of burning as much of a dirty fuel as possible, to the complete exclusion of a cleaner, equally available one."  Helping Hand Br. 38.  According to Helping Hand, Sierra Pacific's "basic business purpose for the Facility is to generate steam that will operate its kilns and generate electricity," and "[a]t most, an additional (though dubious) business purpose is to use additional biomass, or primarily biomass."  *Id.* at 42.

But the record does not support Helping Hand's mischaracterization of Sierra Pacific's basic business purpose.

Helping Hand does not seriously grapple with the fact that the proposed cogeneration unit will burn biomass because Sierra Pacific's lumber operations already produce a *surplus* supply of usable biomass fuel—hundreds of thousands of BDTs of *waste* biomass annually. That is, Sierra Pacific's proposed facility will not burn biomass simply because it is biomass or because it is "dirty," but rather to put to productive use the hundreds of thousands of BDTs of waste biomass fuel already produced as a byproduct of its lumber operations.

Helping Hand also criticizes Sierra Pacific and EPA for at times identifying two business purposes of the proposed facility: (1) using surplus biomass fuel and (2) generating steam for lumber drying kilns and generating electricity. Helping Hand Br. 39-41. But there is nothing inconsistent about those purposes; both are fundamental to the proposed project and are flip sides of the same coin. Indeed, both of these purposes are apparent from the first page of Sierra Pacific's permit application: "The boiler associated with the proposed cogeneration unit will burn biomass fuel (i.e., non-treated wood and agricultural crop residues, as well as urban wood-waste and other fuels subject to district approval) generated by the facility, regional lumber manufacturing facilities, and other biomass fuel sources to produce approximately 250,000 pounds of steam per hour." PER748; *see* PER750-

751 ("SPI intends to construct a new cogeneration unit . . . that would burn biomass fuels in a boiler to produce steam that would be used to generate electricity and to heat existing lumber dry kilns at the facility.").

Helping Hand questions the inclusion of urban and agricultural biomass wastes in the list of permissible fuel inputs. Helping Hand Br. 42-43. While it is a basic purpose to use Sierra Pacific's surplus biomass, market conditions and other factors may at times dictate a more diverse biomass fuel mix. PER578. That does not change the fact that requiring natural gas or solar power would fundamentally redefine the fuel source for the proposed facility.

Finally, Helping Hand suggests that if the purpose of the proposed project is to use "primarily" biomass, then additional natural gas would be acceptable so long as biomass is at least 50% of the fuel mix. Helping Hand Br. 43-44. Again, this mischaracterizes a basic business purpose, which is to use *only* biomass during normal boiler operations. Sierra Pacific did not propose a co-fired facility. EPA reasonably rejected Helping Hand's attempt to require Sierra Pacific to fundamentally redesign its proposed facility into a co-fired facility.

### 3. The 10% cap on natural-gas use is consistent with an appropriate BACT analysis

As discussed above, although the proposed cogeneration facility will burn 100% biomass during normal operations, it will use a minimal amount of natural gas for startup and shutdown and to stabilize the burn during abnormal conditions.

Sierra Pacific agreed that as a condition of receiving its permit, its facility would be subject to a federally enforceable limit of no more than 10% natural-gas use. By accepting such a cap, the boiler is exempted from the New Source Performance Standards for emissions of oxides of nitrogen. PER70; 40 C.F.R. § 60.44b(d). In other words, because so little natural gas will be combusted in the boiler, the facility does not even reach the threshold for triggering New Source Performance Standards.

In determining whether requiring additional natural gas would impermissibly redefine the proposed project, the EAB reviewed Sierra Pacific's acceptance of the 10% natural-gas cap. PER70. The EAB reasonably concluded that the permit condition "is perfectly acceptable and lawful" and "not evidence of a project design 'derived for reasons of air quality permitting.'" PER70.

Helping Hand asserts that the EAB essentially allowed the 10% cap on natural-gas use to trump BACT—i.e., that the EAB purportedly relied "on an NSPS emissions limitation to justify relaxing the mandatory, stricter PSD (BACT) standards." Helping Hand Br. 46. According to Helping Hand, if burning more than 10% natural gas is BACT, Sierra Pacific should have been required to do so, regardless of Sierra Pacific's acceptance of the 10% cap.

Helping Hand's premise is mistaken. The reason the EAB discussed the 10% cap is not because this cap somehow supersedes the BACT analysis. Rather,

the EAB carefully reviewed Sierra Pacific's acceptance of the cap to ensure that it was not added "for reasons of air quality permitting."  PER70.  In performing its redefining-the-source analysis, the EAB must ensure that the applicant's definition of its proposed facility is for reasons independent of air permitting.  *Desert Rock*, 14 E.A.D. at 530; *In re Prairie State Generating Co.*, 13 E.A.D. 1, 23 & n.23 (EAB 2006), 2006 WL 2847225 at *18-19 & n.23.  Faithful to that requirement, the EAB here reviewed the 10% cap and concluded that it was not instituted for reasons relating to air permitting but rather "is incidental to the project's basic design."  PER71.

Contrary to Helping Hand's arguments (Helping Hand Br. 49-52), the EAB's conclusion is correct:  the reason Sierra Pacific agreed to the 10% cap for natural-gas use was not to somehow evade BACT or for other air-quality-permitting purposes, but rather because the use of natural gas as the project is designed already will fall well below the 10% limit.  As the EAB explained, the only reason the proposed design includes any natural-gas use at all is that it will be needed for startup, shutdown, and flame stabilization because "that fuel—rather than biomass—can best be used to increase combustion temperatures in a controlled fashion and to stabilize the boiler flame during transitional periods." PER71; *see* PER743, 750, 752.  This will occur "as infrequently as possible," with only one planned shutdown and startup each year.  PER300.  Sierra Pacific's

minimal use of natural gas for these limited purposes is therefore expected to fall far below the 10% limit. The 10% limit would allow Sierra Pacific to burn natural gas for approximately 3,000 hours each year, yet natural gas is expected to be burned at the proposed boiler no more than 500 hours per year. PER589. Helping Hand offers nothing to rebut these figures.

As the EAB reasonably concluded, the 10% cap on natural gas is consistent with the project's inherent design to use 100% biomass during normal operations and to use natural gas only when necessary. The fact that the cap is set at six times the proposed design's expected use of natural gas—i.e., that the proposed design does not come anywhere close to hitting the 10% cap—demonstrates that the cap is incidental to the project's inherent design, not imposed for air-quality-permitting purposes.

Finally, Helping Hand asserts that Sierra Pacific "elected to cap natural gas at 10% for another air quality permitting reason: cost savings." Helping Hand Br. 51. The EAB has explained that "cost savings generally is not a sufficient purpose or objective that would justify treating a design element as basic or fundamental. Instead, cost is generally considered at step 4 of the top-down BACT review method." *Prairie State*, 13 E.A.D. at 23 n.23 (citing New Source Manual at p. B.8, B.26-.45). But Sierra Pacific has not asserted cost savings as a fundamental design element of the proposed project. In *Prairie State*, the EAB observed that "the

54

identification of a 30-year fuel supply under common ownership or control and co-located with the electric power generating plant would appear to be a valid purpose or objective that is independent of air quality permitting." *Id.* at 24. The EAB went on to explain that "[w]hile cost savings may be a factor, utilization of this particular coal resource is the primary objective." *Id.* The same is true here: even if cost savings result, the proposed facility's primary purpose is to use Sierra Pacific's surplus biomass to generate steam and electricity, which is a valid objective. At the very least, Helping Hand does not point to anything in the record to undermine this conclusion.

Requiring use of a greater percentage of natural gas, when Sierra Pacific designed its boiler to utilize minimal natural gas only at startup, shutdown, and for flame stabilization, would have constituted redefinition of the source, and EAB properly rejected Helping Hand's argument to the contrary. This Court should do the same.

### C. Helping Hand's Argument Concerning The Use Of Solar Energy As Control Technology For Natural Gas Is Waived And, In Any Event, Would Improperly Redefine The Project

Finally, Helping Hand contends that even if requiring the use of solar power in place of biomass would have improperly redefined the source, the EAB should have evaluated whether Sierra Pacific should be required to use solar energy as a control technology for *natural gas*. Helping Hand Br. 52-55. Helping Hand

appears to argue that the EAB should have considered requiring Sierra Pacific to use solar energy, rather than natural gas, for the boiler's startup and shutdown and for fuel stabilization. Helping Hand unfairly faults the EAB, claiming it acted arbitrarily because it "never discussed solar energy as a control measure for combusting natural gas, or found that it was technically infeasible." Helping Hand Br. 54.

The EAB never discussed this argument because Helping Hand never argued to the EAB that solar energy could be a control technology for natural gas. Rather, Helping Hand discussed use of solar energy only in lieu of biomass. PER370-372. Indeed, Helping Hand's brief in this Court states only that Helping Hand made this argument to EPA Region 9 (as opposed to the EAB). Helping Hand Br. 52. This argument is accordingly waived, and this Court should not consider it. *United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness" to an agency "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."); *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979) ("[A]bsent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time.").

In any event, although the EAB did not reach this waived argument, EPA concluded that "[a] solar component for this Project presents a significant departure from the existing facility's operations and the Project's purpose." PER391. That determination is undoubtedly correct. As the EAB explained, one of the designs of the proposed facility is to use natural gas during boiler startup and shutdown and to stabilize the burn. PER71. Sierra Pacific specifically chose natural gas for a particular reason: "because that fuel—rather than biomass—can best be used to increase combustion temperatures in a controlled fashion and to stabilize the boiler flame during transitional periods." PER71. Although the burning of natural gas is not itself a primary business purpose of the proposed project, it is inherent in the project, and requiring solar rather than natural gas would impermissibly redefine the project.

Natural gas will play a key role during startup and shutdown. As Sierra Pacific explained to EPA, during the boiler's startup the boiler must be "heated gradually to avoid stresses that could physically damage the boiler if it were heated too quickly." PER752. This "will be accomplished using the natural gas-fired burners firing pipeline natural gas." PER752. "Heating will continue using the natural gas burners until the furnace is hot enough to introduce biomass fuel to the furnace." PER752. "After biomass fuel is introduced to the furnace, the natural gas firing rate will be reduced to maintain a steady heat rate." PER752. "For the

remainder of the startup period, the biomass-fuel feed rate will increase until the

desired firing rate is achieved and the natural gas firing is no longer needed."

PER752.

Natural gas also will be burned "during boiler shutdown to burn any

remaining wood ash in order to prevent temperature excursions." PER752.

Likewise, natural gas is important to stabilizing the burn, to preclude

excessive carbon-monoxide emissions. For example, after a large amount of

rainfall, there may be a pocket of wet fuel in the boiler, which could cause the

flame to become unstable and cause carbon-monoxide emissions to rise. AER930.

It normally takes one to three hours to purge and replace the wet fuel with drier

fuel. AER930. The ability to burn natural gas during this period allows Sierra

Pacific to stay within its permit limit for carbon monoxide, until the boiler can

return to normal operation. AER930.

Key in all three of these scenarios—startup, shutdown, and flame

stabilization—is that a combustible material is either burned alongside the biomass

fuel or used to burn up the remaining wood in the boiler. But solar energy is not a

ready source of fuel that could be combusted in the boiler along with biomass or

could be used to burn up the remaining biomass. Requiring use of solar instead of

natural gas for these purposes would require "a significant departure" from the

58

proposal.  PER391.  It would involve redesigning the proposed project, and

accordingly solar would not be a control technology.

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

Dated:  October 9, 2015

  /s/ Joseph R. Palmore

WILLIAM M. SLOAN
DAN GERSHWIN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
WSloan@mofo.com
DGershwin@mofo.com

JOSEPH R. PALMORE
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  202.887.6940
JPalmore@mofo.com

*Counsel for Intervenor*
*Sierra Pacific Industries, Inc.*

## STATEMENT OF RELATED CASES PURSUANT TO
## CIRCUIT RULE 28-2.6

Counsel for Sierra Pacific Industries, Inc. is unaware of any related cases

pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 9, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  October 9, 2015                                   _____ /s/ Joseph R. Palmore _____

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it is 13,190 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2010 in 14-point Times New Roman font.


Dated:  October 9, 2015                          _____ s/ Joseph R. Palmore _____

dc-807687