Case Nos. 14-72553 and 14-72602

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HELPING HAND TOOLS, *et al.*,
Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
Respondents,

and

SIERRA PACIFIC INDUSTRIES
Respondent-Intervenor

---

On Petition for Review of Final Action of the
United States Environmental Protection Agency

---

## BRIEF OF AMICI CURIAE AMERICAN WOOD COUNCIL AND
## NATIONAL ALLIANCE OF FOREST OWNERS

---

Roger R. Martella, Jr.
Joel F. Visser
James R. Wedeking
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
jwedeking@sidley.com

*Counsel for American Wood Counsel and
National Alliance of Forest Owners*

Date: October 9, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 23.1 of the Federal Rules of Appellate Procedure, the amici make the following disclosures.

**American Wood Council.** AWC is the voice of North American traditional and engineered wood products, representing over 75% of the industry that provides approximately 400,000 men and women with family-wage jobs. AWC members make products that are essential to everyday life from a renewable resource that absorbs and sequesters carbon. AWC has no parent corporation, and no publicly held company has a ten percent (10%) or greater ownership interest in AWC.

**National Alliance of Forest Owners.** NAFO is a national trade association representing private forest owners who manage more than 80 million acres of private forests in 47 states. NAFO's mission is to protect and enhance the economic and environmental values of private forests through targeted policy advocacy at the national level. NAFO has no parent companies, and no publicly-held company has a 10% or greater ownership interest in NAFO.

## STATEMENT OF COMPLIANCE WITH RULE 29(C)(5)

This brief is submitted pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure with the leave of the Court.

No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the amici curiae, their members, or their counsel, contributed money that was intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT......................................................i

STATEMENT OF COMPLIANCE WITH RULE 29(C)(5)............................ii

TABLE OF CONTENTS...............................................................................iii

TABLE OF AUTHORITIES............................................................................v

GLOSSARY...................................................................................................ix

IDENTITY OF AMICI CURIAE......................................................................1

INTEREST OF AMICI CURIAE......................................................................1

SUMMARY OF ARGUMENT........................................................................2

ARGUMENT..................................................................................................3

I.  DETERMINING BACT FOR BIOGENIC $CO_2$ EMISSIONS IMPLICATES
    DISTINCT CONSIDERATIONS FROM FOSSIL FUELS..............................3

    A.  The Role of Carbon Sinks in Regulating Earth's Climate...........................4

    B.  Forest Biomass Is a Carbon Sink That Can Reduce Net $CO_2$ Emissions 5

        1.  Well-Managed Forests Reduce Atmospheric $CO_2$ Concentrations6

        2.  Private Forests Are Managed for Long-Term Productivity That
            Promotes the Forest Carbon Cycle........................................................8

        3.  Promoting Carbon Benefits Through Biomass Energy Is an
            Effective Component of an Integrated Forest Management
            Program.............................................................................................14

    C.  Capturing Energy Value From Biomass Residuals Has Significant
        Climate Benefits..................................................................................17

    D.  Government Agencies Have Consistently Recognized the Climate
        Benefits of Biomass Energy and Provided for Favorable Regulatory
        Treatment............................................................................................19

II.    EPA POLICY CONCERNING BIOGENIC $CO_2$ EMISSIONS PROPERLY
       ESTABLISHED A REASONABLE BASIS FOR EVALUATING
       PROJECTS COMBUSTING BIOMASS .............................................................21

III.   EPA ACTED REASONABLY AND CONSISTENTLY WITH THE
       BIOMASS BACT ANALYSIS WHEN IT ISSUED SPI'S PSD PERMIT ......24

IV.    EPA ACTED REASONABLY IN SPECIFYING THE BIOMASS
       FEEDSTOCKS THAT SPI WOULD COMBUST AT ITS BIOMASS
       ENERGY FACILITY ...............................................................................28

CONCLUSION ...............................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hawaiian Elec. Co., Inc. v. EPA,*
  723 F.2d 1440 (9th Cir. 1984)......................................................................25

**Statutes**

42 U.S.C. § 7475 ................................................................................... 3, 27

42 U.S.C. § 7479 .............................................................................3, 4, 22, 27

**Other Authorities**

40 C.F.R. § 98.3...............................................................................................20

40 C.F.R. § 98.6...............................................................................................20

Bowyer, J., *et al.*, *Carbon 101: Understanding the Carbon Cycle and the Forest
  Carbon Debate* (2012), *available at*
  http://www.dovetailinc.org/report_pdfs/2012/dovetailcarbon101ja
  n2012.pdf. ................................................................................... 8, 11

Bowyer, J., *et al.*, *Life Cycle Impacts of Forest Management and Bioenergy
  Production* (2011), *available at Available at*
  http://www.dovetailinc.org/report_pdfs/2011/dovetaillcabioenergy
  0711.pdf ...............................................................................................7

Cherubini, F., *GHG balances of bioenergy systems – Overview of key steps in the
  production chain and methodological concerns*, Renewable Energy 35(7):
  1565-73 (2010), *available at*
  http://www.sciencedirect.com/science/article/pii/S0960148109005
  230...................................................................................................12

DOE, *Technical Guidelines: Voluntary Reporting of Greenhouse Gases (1605(b))
  Program* (2007), *available at*
  http://www.eia.gov/oiaf/1605/January2007_1605bTechnicalGuideli
  nes.pdf...............................................................................................20

EPA, Clean Power Plan (prepublication version) (Aug. 3, 2015),
  *available at* http://www3.epa.gov/airquality/cpp/cpp-final-rule.pdf ................ 19, 28

EPA, *Guidance for Determining Best Available Control Technology for Reducing Carbon Dioxide Emissions From Bioenergy Production* (2011), *available at* http://www3.epa.gov/nsr/ghgdocs/bioenergyguidance.pdf .......................21, 22, 23

EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2013 (2015), *available at* http://www3.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2015-Main-Text.pdf. ................................................................ 6, 13

EPA, Memorandum from Janet McCabe to Air Division Directors, Regions 1-10 re: Addressing Biogenic Carbon Dioxide Emissions from Stationary Sources (Nov. 19, 2014), *available at* http://www3.epa.gov/climatechange/downloads/Biogenic-CO2-Emissions-Memo-111914.pdf ............................................................... 20, 28

EPA New Source Review Workshop Manual (Draft Oct. 1990), *available at* http://www2.epa.gov/sites/production/files/2015-07/documents/1990wman.pdf. ...................................................................26

EU Guidelines for the monitoring and reporting of greenhouse gas emissions, Annex I, 4.2.2.1.6 (Jan. 29, 2004), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32004D0156 .......................21

Galik, C.S. and R.C. Abt, *The Effect of Assessment Scale and Metric Selection on the Greenhouse Gas Benefits of Woody Biomass*, Biomass & Bioenergy (2012), *available at* http://www.sciencedirect.com/science/article/pii/S0961953412001808.......................................................................................................9

Heath, L., *et al.*, *Greenhouse gas and carbon profile of the U.S. forest products industry value chain*, Environmental Science and Technology 44: 3999-4005 (2010), *available at* http://pubs.acs.org/doi/pdf/10.1021/es902723x .......................................................8

Ince, P.J., *Global Sustainable Timber Supply and Demand*, *in* Sustainable Development in the Forest Products Industry, Chapter 2, 29-41 (2010), *available at* http://www.fpl.fs.fed.us/documnts/pdf2010/fpl_2010_ince001.pdf.............. 14, 15

Kingsley, E., *Importance of Biomass Energy Markets to Forestry: New England's Two Decades of Biomass Energy Experience* (2012), *available at* http://www.usendowment.org/images/Importance_of_Biomass_Energy_Markets_to_Forestry_6.2012.pdf .................................................. 15, 16

Lattimore, B., *et al.*, *Environmental Factors in woodfuel production: Opportunities, risks and criteria and indicators for sustainable practices and utilization*, Biomass and Energy 33: 1321-42 (2009), *available at* http://www.sciencedirect.com/science/article/pii/S096195340900124X ........................................................................................................................12

Lippke, B., *et al.*, *Life cycle impacts of forest management and wood utilization on carbon mitigation: knowns and unknowns*, Carbon Management 2(3): 303-33 (2011), *available at* http://www.eesi.org/files/Lippke-etal-2011-CarbonLifeCycle.pdf ........................................................................................12

Lubowski, R.N., *et al.*, USDA, *Environmental Effects of Agricultural Land-Use Change: The Role of Economics and Policy*, Economics Research Report No. 25 (2006), *available at* http://www.ers.usda.gov/publications/err-economic-research-report/err25.aspx ....................................................................14

Malmshimer, R.W*., et al.*, *Managing Forest Because Carbon Matters:  Integrating Energy, Products, and Land Management Policy*, Journal of Forestry 109(7S) (2011), *available at* http://www.safnet.org/documents/JOFSupplement.pdf ..........................................11

Miner, R., *et al.*, *Forest Carbon Accounting Considerations in U.S. Bioenergy Policy, Journal of Forestry* (2014), *available at* http://www.safnet.org/documents2014/ForestCarbonAccountingConsiderations_nov2014.pdf .................................................................... 18, 27

Naaburs, G.J., *et al.*, *Forestry*, Chapter 9 *in* Climate Change 2007: Mitigation.  Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change (B. Metz, *et al.*, eds.) (2007), *available at* https://www.ipcc.ch/publications_and_data/ar4/wg3/en/ch9s9-es.html ....................................................................................................................7

NCASI, *Greenhouse Gas and Fossil Fuel Benefits of Using Biomass Manufacturing Residuals for Energy Production in Forest Products Facilities*, Technical Bulletin No. 1016 (2014), *available at* http://www.ncasi.org/Downloads/Download.ashx?id=9603 ........................... 18, 27

Ryan, M.G., *et al.*, *A synthesis of the science on forests and carbon for U.S. forests*, Issues in Ecology 13:1 (2010), *available at* http://www.fs.fed.us/rm/pubs_other/rmrs_2010_ryan_m002.pdf .......................7, 8

Searchinger, T., *et al.*, *Avoiding Bioenergy Competition for Food Crops and Land*. World Resources Institute (2015), *available at* http://www.wri.org/sites/default/files/avoiding_bioenergy_competition_food_crops_land.pdf .................................................................18

Sedjo, R., *Carbon Neutrality and Bioenergy: A Zero-Sum Game?*, Resources for the Future Discussion Paper (2011), *available at* http://www.rff.org/files/sharepoint/WorkImages/Download/RFF-DP-11-15.pdf ........................................................................ 9, 14

Strauss, W., *How Manomet got it backwards: Challenging the "debt-then-dividend" axiom*, Biomass Magazine (2011), *available at* http://biomassmagazine.com/articles/5621/how-manomet-got-it-backwards-challenging-the-undefineddebt-then-dividendundefined-axiom ..........................................................................................9

USDA, *Baseline Estimates of Carbon Stocks in Forests and Harvested Wood Products for National Forest System Units: Pacific Southwest Region* (2015), *available at* http://www.fs.fed.us/climatechange/documents/PacificSouthwestRegionCarbonAssessment.pdf. ........................................................7

USDA*, Future of America's Forests and Rangelands: Forest Service 2010 Resource Planning Act Assessment*, Gen. Tech. Rep. WO-87 (2012), *available at* http://www.fs.fed.us/research/publications/gtr/gtr_wo87.pdf .............................15

USDA, *U.S. Forest Resources Facts and Historical Trends* (2014), *available at* http://www.fia.fs.fed.us/library/brochures/docs/2012/ForestFacts_1952-2012_English.pdf.........................................................13

## GLOSSARY

| | |
|---|---|
| AWC | American Wood Council |
| BACT | Best Available Control Technology |
| CAA | Clean Air Act |
| CCS | Carbon Capture and Storage |
| $CO_2$ | Carbon Dioxide |
| $CO_2e$ | Carbon Dioxide Equivalent |
| CPP | Clean Power Plan |
| EPA | Environmental Protection Agency |
| GHG | Greenhouse Gas |
| MMT | Million Metric Tons |
| NAFO | National Alliance of Forest Owners |
| NCASI | National Council for Air and Stream Improvement |
| PSD | Prevention of Significant Deterioration |
| SAB | Science Advisory Board |
| SPI | Sierra Pacific Industries |

## IDENTITY OF AMICI CURIAE

The American Wood Council ("AWC") is the voice of North American traditional and engineered wood products, representing over 75% of the industry that provides approximately 400,000 men and women with family-wage jobs. AWC members make products that are essential to everyday life from a renewable resource that absorbs and sequesters carbon.

The National Alliance of Forest Owners ("NAFO") is a national trade association representing private forest owners who manage more than 80 million acres of private forests in 47 states. NAFO's mission is to protect and enhance the economic and environmental values of private forests through targeted policy advocacy at the national level.

## INTEREST OF AMICI CURIAE

This case involves two petitions for review of a Clean Air Act ("CAA") Prevention of Significant Deterioration ("PSD") permit that the Environmental Protection Agency ("EPA") issued to Sierra Pacific Industries ("SPI") to construct a biomass energy facility. Petitioners allege that EPA failed to conduct an appropriate analysis before setting limits for biogenic carbon dioxide ("$CO_2$") emissions from the facility. In doing so, petitioners challenge EPA's application of both (1) the CAA and (2) EPA's current biogenic $CO_2$ emissions guidance in issuing the PSD permit for SPI's proposed biomass energy facility.

The amici are two national trade associations that represent private forest owners, wood products manufacturers, and other companies in the forestry and forest products industries. As both stewards of forest biomass and generators of large quantities of biomass residuals that can be combusted for energy, amici's member companies have a direct, strong, and specific interest in EPA's treatment of biogenic $CO_2$ emissions under the CAA. Accordingly, the amici have been active participants in regulatory matters before EPA and state regulatory agencies, in scientific evaluations of biogenic $CO_2$ emissions before EPA's Science Advisory Board ("SAB"), and in litigation related to the appropriate treatment of biogenic $CO_2$ emissions under the CAA as parties and intervenors. SPI is a member of both amici. As a result, the amici have both a strong interest in how this case could affect SPI's interests directly and also, importantly, a broader interest in how this case may affect other members seeking to construct or modify biogenic $CO_2$-emitting facilities in the future.

## SUMMARY OF ARGUMENT

EPA acted reasonably and consistent with the CAA in establishing SPI's PSD permit conditions for greenhouse gas ("GHG") emissions. EPA reasonably determined that combusting waste wood, mill residues, forest residues, and non-merchantable forest biomass consisting of byproducts and residuals of forest management activities harvested for the purpose of forest fire fuel reduction or forest stand improvement for energy is itself a control option that mitigates the net impact

2

of the facility's emissions on atmospheric $CO_2$ concentrations. So long as forests stocks are stable or increasing, or if secondary materials including mill residues or harvest residues are used as energy feedstocks, biomass energy offers significant climate benefits when compared to burning fossil fuel. EPA acted reasonably and consistently with its own guidance in recognizing the GHG mitigation benefits of SPI's proposed use of biomass fuels, concluding that there were no feasible add-on controls that could further reduce $CO_2$ emissions from SPI's proposed cogeneration facility, and approving energy-efficient design and operational best practices as the only viable additional means to control $CO_2$ emissions on-site at the facility.

## ARGUMENT

## I. DETERMINING BACT FOR BIOGENIC $CO_2$ EMISSIONS IMPLICATES DISTINCT CONSIDERATIONS FROM FOSSIL FUELS

The CAA's PSD provisions state that "[n]o major emitting facility…may be constructed…unless:…(4) the proposed facility is subject to the best available control technology [("BACT")] for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility." 42 U.S.C. § 7475(a)(4). BACT is defined as "an emission limitation based on the maximum degree of [pollutant] reduction…which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility…." *Id.* § 7479(3). Critically, BACT is evaluated on a case-by-case basis and, thus, both the permitting process and eventual permit conditions

3

can vary between sources. *Id.* Further, BACT is not focused solely on environmental issues, but also requires the permit writer to consider energy and economic impacts. *Id.*

Combusting biomass for energy presents distinct considerations from fossil fuels in determining BACT for biogenic $CO_2$ emissions. Biomass is a renewable resource that is grown and then harvested for a multitude of valuable uses. This forest carbon cycle can repeat indefinitely as long as forests are managed for long-term productivity and forest owners continue to invest in future forest rotations. In addition, for many biomass feedstocks, GHGs will be emitted even if the biomass is not combusted for energy because the biomass would otherwise be discarded and produce GHG emissions during decomposition. As explained in greater detail below, these unique aspects of biogenic $CO_2$ emissions require a distinct approach to BACT analyses. EPA policy, and EPA's BACT determination in this case, appropriately reflect the distinctive nature of biomass energy.

## A. The Role of Carbon Sinks in Regulating Earth's Climate

GHGs play a critical role in regulating Earth's climate. The "greenhouse gas effect" has long been recognized as an essential feature in sustaining life on Earth. GHGs, including water vapor, $CO_2$, ozone, and other chemicals in the atmosphere trap thermal energy from the sun and warm the earth. Without these chemicals in the atmosphere, Earth would be too cold to support life. At the same time, changes in atmospheric GHG concentrations cause changes in Earth's climate.

4

To understand how atmospheric $CO_2$ concentrations change over time, it is necessary to understand the role of carbon sources and carbon sinks: *carbon sources* are processes that add more carbon to the atmosphere; *carbon sinks* are processes that remove carbon from the atmosphere.

**B.    Forest Biomass Is a Carbon Sink That Can Reduce Net $CO_2$ Emissions**

Conducting a BACT analysis for biogenic $CO_2$ emissions requires a baseline understanding of the forest carbon cycle and the role that biomass energy plays within the forestry and forest products sectors.  Forests represent one of the largest terrestrial carbon pools on the planet and can play a significant role in addressing climate change through the forest carbon cycle.  Because forests can both sequester and emit carbon, they have the potential to serve as either carbon sources or sinks.  In the United States forests are the nation's largest carbon sink and play a critical role in combating climate change, both by storing carbon in terrestrial pools and products and by substituting biomass for other products and fuels that produce large—and effectively permanent—increases in atmospheric $CO_2$ concentrations.  As a result, even though combusting biomass for energy emits $CO_2$ at the time of combustion, utilizing biomass for energy has a net positive effect on climate change because, in contrast to fossil fuel alternatives, biomass is part of a balanced forest carbon cycle that continuously captures carbon.  Thus, when biomass energy is properly evaluated within the broader context of forests that are actively managed for long-term

5

productivity and of the use of biomass residuals for energy, the climate benefits of

biomass energy become clear.

### 1. Well-Managed Forests Reduce Atmospheric $CO_2$ Concentrations

U.S. forests play a critical role in combating climate change by removing $CO_2$

from the atmosphere. The scientific principles of the forest carbon cycle are well-

understood and non-controversial. Carbon from the atmosphere is sequestered in

forests through photosynthesis and emitted through respiration, decomposition, and

combustion. The dynamic processes of carbon sequestration and emission occur

simultaneously on the landscape and form an ongoing cycle by which emitted carbon

is sequestered. In this respect, forest biomass carbon is fundamentally different from

fossil fuels which were formed over millennia and cannot be regenerated after being

combusted for energy.

As a result of the forest carbon cycle, forests represent the largest carbon sink

in the United States. EPA's most recent GHG Inventory concluded that the

sequestration of carbon in forests offset 13.2% of the United States' total GHG

emissions in 2013. EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks:

1990-2013 ES-8 (2015) ("2013 GHG Inventory").[1] But the carbon benefits of the

forestry and forest products sectors go far beyond storing carbon in living trees. The

---

[1] *Available at* http://www3.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2015-Main-Text.pdf.

forest products industry produces many durable products, such as lumber for homes and other buildings, that continue to store carbon long after trees are harvested and stands are replanted. *See, e.g.*, Ryan, M.G., *et al.*, *A synthesis of the science on forests and carbon for U.S. forests*, Issues in Ecology 13:1, 10 (2010).[2] Forest products can also reduce net $CO_2$ emissions by substituting for other, more carbon intensive products, such as steel and concrete used in construction. *See, e.g.*, USDA, *Baseline Estimates of Carbon Stocks in Forests and Harvested Wood Products for National Forest System Units: Pacific Southwest Region* (2015);[3] Bowyer, J., *et al.*, *Life Cycle Impacts of Forest Management and Bioenergy Production* 8 (2011)[4]. Likewise, biomass can substitute for fossil fuels, either in electricity production or as a transportation fuel. In this respect, utilizing biomass feedstocks for energy while simultaneously manufacturing forest products can improve profitability while adding incremental environmental benefits. Naaburs, G.J., *et al.*, *Forestry*, Chapter 9 *in* Climate Change 2007: Mitigation. Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel

---

[2] *Available at* http://www.fs.fed.us/rm/pubs_other/rmrs_2010_ryan_m002.pdf.

[3] *Available at* http://www.fs.fed.us/climatechange/documents/PacificSouthwestRegionCarbonAssessment.pdf.

[4] *Available at* http://www.dovetailinc.org/report_pdfs/2011/dovetaillcabioenergy0711.pdf.

on Climate Change (B. Metz, *et al.*, eds.) (2007)[5] ("In the long-term, a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, while producing an annual sustained yield of timber, fibre or energy from the forest, will generate the largest sustained mitigation benefit."); Ryan (2010) at 10 ("[T]he maximum potential benefit from a project that reestablished forest increases if the stand is periodically harvested and the wood is used for substitution and the biomass used for fuel."); Heath, L., *et al.*, *Greenhouse gas and carbon profile of the U.S. forest products industry value chain*, Environmental Science and Technology 44: 3999-4005 (2010)[6] (explaining that active forest management that produces forest products and biomass energy reduces overall atmospheric GHG concentrations).

### 2. Private Forests Are Managed for Long-Term Productivity That Promotes the Forest Carbon Cycle

To fully understand how off-site carbon sequestration should be incorporated into a GHG BACT analysis for biomass energy production, it is critical to understand how private forests are managed. Because trees require a long-term investment before harvest, forests are managed for long-term productivity on a landscape scale. Each stand is part of a larger forest management plan that includes multiple stands at different stages of development. Bowyer, J., *et al.*, *Carbon 101: Understanding the Carbon*

---

[5] *Available at* https://www.ipcc.ch/publications_and_data/ar4/wg3/en/ch9s9-es.html.

[6] *Available at* http://pubs.acs.org/doi/pdf/10.1021/es902723x.

*Cycle and the Forest Carbon Debate* 7 (2012).[7]  At any given period in time, a few stands will undergo harvest or other stand improvement projects while the vast majority continue to grow and sequester more carbon.  Thus, it makes little sense to evaluate the effects of biomass energy, or of timber harvest in general, in a stand-by-stand manner because it fails to recognize the effects taking place on other stands that are part of the overall forestry regime.  Galik, C.S. and R.C. Abt, *The Effect of Assessment Scale and Metric Selection on the Greenhouse Gas Benefits of Woody Biomass*, Biomass & Bioenergy 44: 1-7 (2012)[8] ("state, procurement area, and landowner assessment scales most closely approximate the actual GHG emission implications" of biomass energy); Sedjo, R., *Carbon Neutrality and Bioenergy:  A Zero-Sum Game?*, Resources for the Future Discussion Paper 1-9 (2011)[9] (explaining that a broad geographic scale for carbon accounting is necessary to reflect the simultaneous growth and harvest that take on individual stands within a managed forest landscape); Strauss, W., *How Manomet got it backwards:  Challenging the "debt-then-dividend" axiom*, Biomass Magazine (2011)[10] (same).

---

[7] *Available at*
http://www.dovetailinc.org/report_pdfs/2012/dovetailcarbon101jan2012.pdf.

[8] *Available at* http://www.sciencedirect.com/science/article/pii/S0961953412001808.

[9] *Available at* http://www.rff.org/files/sharepoint/WorkImages/Download/RFF-DP-11-15.pdf.

[10] *Available at* http://biomassmagazine.com/articles/5621/how-manomet-got-it-backwards-challenging-the-undefineddebt-then-dividendundefined-axiom.

Forest managers maintain a consistent level of carbon capital in the forest and only harvest a portion of the accrued interest. As a result, when private forests are managed for long-term productivity, forest carbon stocks remain stable over time. This has important implications for assessing the net climate impacts of biomass energy. As shown in Figure 1, while an individual forest stand exhibits forest carbon highs and lows based on when the stand is harvested, these small-scale changes in forest carbon stocks net to zero when evaluated at the broader landscape scale over which forests are managed.

Figure 1



A Depiction of Forest Carbon in a Sustainably Managed Forest at Stand, Parcel, and Landscape Levels

Source: Bowyer (2012) at 6.

Thus, at the forest landscape level, the net GHG emissions from private working forests will remain at zero over the long-term, even if a portion of the biomass that is harvested each year is combusted for energy.  Malmshimer, R.W., *et al.*, *Managing Forest Because Carbon Matters:  Integrating Energy, Products, and Land Management Policy*, Journal of

11

Forestry 109(7S) (2011)[11] (concluding that there will be no net $CO_2$ emissions from biomass energy as long as forest carbon stocks are stable or increasing because emissions will be offset entirely by carbon sequestration); Lippke, B., *et al.*, *Life cycle impacts of forest management and wood utilization on carbon mitigation: knowns and unknowns*, Carbon Management 2(3): 303-33 (2011)[12] (same); Cherubini, F., *GHG balances of bioenergy systems – Overview of key steps in the production chain and methodological concerns*, Renewable Energy 35(7): 1565-73 (2010)[13] ("When biomass is combusted, the resulting $CO_2$ is not counted for a GHG because C has a biological origin and combustion of biomass releases almost the same amount of $CO_2$ as was captured by the plant during its growth."); Lattimore, B., *et al.*, *Environmental factors in woodfuel production: Opportunities, risks, and criteria and indicators for sustainable practices and utilization*, Biomass and Energy 33: 1321-42 (2009)[14] (explaining that biomass energy from sustainably managed forests is carbon neutral).

Forest managers' success in maintaining stable carbon stocks over time is well-established. On a national level, forest carbon stocks have been increasing at a rate of approximately 880,000 million metric tons ("MMT") of carbon dioxide equivalent

---

[11] *Available at* http://www.safnet.org/documents/JOFSupplement.pdf.

[12] *Available at* http://www.eesi.org/files/Lippke-etal-2011-CarbonLifeCycle.pdf.

[13] *Available at* http://www.sciencedirect.com/science/article/pii/S0960148109005230.

[14] *Available at* http://www.sciencedirect.com/science/article/pii/S096195340900124X.

("$CO_2e$") per year. 2013 GHG Inventory at ES-6. EPA noted that this growth is due in part to active forest management practices that have "resulted in higher growth rates and higher biomass density." *Id.* at 2-21. The same trend is evident at the regional level. United States Forest Service data shows that forest carbon stocks have been steadily increasing across all regions of the United States for more than 60 years, including a nearly 10% increase in the western region. *See* USDA, *U.S. Forest Resources Facts and Historical Trends* 23 (2014).[15] Furthermore, carbon stocks *per acre* have also increased over the past 60 years, meaning that even as forestry production has continued to advance, overall sequestration is increasing on actively managed forest lands. *See, e.g., id.* at 26.

Finally, it is important to understand that regular timber harvests are an essential aspect of forest management, particularly on private land. While some publicly owned forests are reserved, unmanaged forest growth is unrealistic for privately owned forests. It is impractical and inconsistent with forest management practices to assume, in a BACT analysis, a baseline trajectory of indefinite forest growth in the absence of harvest for biomass energy and other forest products. Instead, if there were no market for forest biomass feedstocks, forest owners may seek other investments, leading to land use changes that would decrease—not

---

[15] *Available at*
http://www.fia.fs.fed.us/library/brochures/docs/2012/ForestFacts_1952-2012_English.pdf.

13

increase—terrestrial carbon stocks. Sedjo (2011) (explaining that bioenergy contributes to strong markets for forest products and creates incentives for forest owners to invest in forests rather than alternative land uses); Ince, P.J., *Global Sustainable Timber Supply and Demand*, *in* Sustainable Development in the Forest Products Industry, Chapter 2, 29-41 (2010)[16] (finding positive correlation between markets for forest products, including bioenergy, and annual increases in forest carbon stocks); Lubowski, R.N., *et al.*, USDA, *Environmental Effects of Agricultural Land-Use Change: The Role of Economics and Policy*, Economics Research Report No. 25 (2006)[17] (concluding that in the absence of market incentives, many working forests would be converted to non-forest uses). Thus, strong and vibrant timber markets including markets for biomass energy help to maintain and promote forest carbon stocks.

      **3.    Promoting Carbon Benefits Through Biomass Energy Is an Effective Component of an Integrated Forest Management Program**

In addition, assessing the carbon benefits of biomass energy requires an understanding of how biomass energy fits into the broader forest products sector and which biomass feedstocks are likely to be used for biomass energy production. While biomass energy offers an opportunity to displace fossil fuels with a renewable source

---

[16] *Available at* http://www.fpl.fs.fed.us/documnts/pdf2010/fpl_2010_ince001.pdf.

[17] *Available at* http://www.ers.usda.gov/publications/err-economic-research-report/err25.aspx.

of energy, it is important to understand that healthy, long-rotation forests will not be harvested for energy production. A fundamental tenet of forest management is to produce timber that can be used to make high-value wood products. Supply of the highest-value timber is limited and, as a result, these feedstocks can be sold at a significant premium compared to common biomass energy feedstocks. Thus, for example, healthy, long-rotation trees will be sold at a premium for sawtimber, furniture, and other high-value products.

In contrast, biomass energy facilities rely on lower-cost feedstocks. USDA, *Future of America's Forests and Rangelands: Forest Service 2010 Resource Planning Act Assessment*, Gen. Tech. Rep. WO-87 (2012)[18] (projecting that large, long-rotation trees are unlikely to be used for bioenergy due to price competition from higher value forest products); Ince (2010) (explaining that biomass energy feedstocks are among the lowest value forest products); Kingsley, E., *Importance of Biomass Energy Markets to Forestry: New England's Two Decades of Biomass Energy Experience* (2012)[19] (explaining that biomass energy relies on low-cost, low-grade feedstocks, not high-grade feedstocks that command higher prices in the market). Thus, the carbon benefits of biomass are

---

[18] *Available at* http://www.fs.fed.us/research/publications/gtr/gtr_wo87.pdf.

[19] *Available at* http://www.usendowment.org/images/Importance_of_Biomass_Energy_Markets_to_Forestry_6.2012.pdf.

derived by displacing fossil fuels as part of an integrated forest management plan that simultaneously produces biomass energy feedstocks alongside high-value products.

In addition, a robust biomass energy market can improve forest health and promote carbon sequestration by providing a market for low-grade trees and thinnings that must be harvested for stand improvement purposes. Kingsley (2012) at 5 ("[B]iomass fuel provides…a market for low-grade wood that encourages thinning and other forestry practices that support long-term value generation through the growth of high quality timber"). Thus, in many cases, biomass energy can provide a secondary market that improves the economic viability of the forestry and forest products industries while producing important climate benefits.

At the same time, relying on low-grade timber and low-value secondary products adds challenges for biomass energy facilities. To remain competitive in the energy market, biomass energy facilities must have access to low-cost biomass feedstocks. Simply put, biomass energy facilities could not compete with fossil fuel and other alternatives if they were forced to pay premium prices for high-quality, long-rotation trees. Therefore, biomass energy facilities need to maintain the flexibility to combust a wide range of biomass feedstocks based on availability and cost. Changing market conditions can have a profound effect on the availability of secondary products. For example, the 2008 recession reduced demand for new housing, which lead to reduced timber harvests for new construction and, as a result, reduced forestry residuals that could be used for biomass energy. In addition, changes

16

in other lower value timber markets can also affect the prices and availability of biomass for energy production. The closure of pulp and paper mills may create new opportunities for biomass energy production, while construction of new oriented strand board facilities may increase competition for certain secondary materials. To ensure continued economic viability over a several-decade life span, it is critical that biomass energy facilities have the flexibility to shift feedstocks in response to changing costs and availability.

### C. Capturing Energy Value From Biomass Residuals Has Significant Climate Benefits

Combustion of manufacturing residuals and other secondary materials for energy produces significant climate benefits. Low-value biomass and manufacturing residuals that have few other uses can be used to generate energy. Thus, members of both the forestry and forest products sectors can use secondary biomass products or byproducts, including sawdust, wood chips, mill residues, forestry residuals such as tree tops and branches and forest biomass harvested for the purpose of forest fire fuel reduction or forest stand improvement to produce energy on-site or through sale to a third party. The creation and use of biomass energy in wood products mills is integral and incidental to the manufacture of products such as lumber, panels, and engineered wood products. In fact, on average, approximately 78 percent of the energy from AWC member facilities is generated from these types of biomass feedstocks.

A recent study by the National Council for Air and Stream Improvement ("NCASI") examined the lifecycle GHG and fossil fuel reduction benefits of using biomass residuals for energy production in the forest products industry.  NCASI, *Greenhouse Gas and Fossil Fuel Reduction Benefits of Using Biomass Manufacturing Residuals for Energy Production in Forest Products Facilities*, Technical Bulletin No. 1016 (2014).[20] Wood processing activities at wood products mills produce a significant volume of biomass residuals, and they are the primary source of energy to run the mills. Accounting for fossil fuel displacement and avoided emissions associated with disposal, the study shows that the use of biomass residuals avoids the emission of approximately 181 MMT of $CO_2$e each year.  (This is equivalent to removing about 35 million cars from the road.)  Other scientists have also recognized the climate benefits of using mill and harvest residues for energy.  *See, e.g.*, Searchinger, T., *et al.*, *Avoiding Bioenergy Competition for Food Crops and Land*, World Resources Institute, at 5; 22; 24, Table 3 (2015)[21] (stating energy use of "timber processing" residuals such as sawdust reduces GHG emissions); Miner, R., *et al.*, *Forest Carbon Accounting Considerations in U.S. Bioenergy Policy, Journal of Forestry* (2014) ("[I]f mill residues were not used for energy, most of these materials would be wastes that would be either

---

[20] *Available at* http://www.ncasi.org/Downloads/Download.ashx?id=9603.

[21] *Available at* http://www.wri.org/sites/default/files/avoiding_bioenergy_competition_food_crops_land.pdf.

incinerated, in which case the atmosphere would see the same biogenic $CO_2$ emissions as if the material had been burned for energy, or disposed in landfills…[in which case] the net impact of burning for energy on biogenic emissions, in terms of warming (i.e., $CO_2$ equivalents), can actually be less than zero because of the warming potency of the methane generated in landfills.").

### D. Government Agencies Have Consistently Recognized the Climate Benefits of Biomass Energy and Provided for Favorable Regulatory Treatment

Recognizing that forests in the United States serve as a carbon sink and that combustion of biomass for energy reduces emissions compared to fossil fuels, EPA and other government bodies have provided for favorable regulatory treatment of biomass energy. Most recently, in the Clean Power Plan ("CPP"), which seeks to reduce GHG emissions from fossil fuel-fired power plants, EPA recognized biomass energy as fossil fuel alternative that "can play a role in controlling increases of $CO_2$ levels in the atmosphere." EPA, Clean Power Plan (prepublication version) 1160 (Aug. 3, 2015) (hereinafter "CPP").[22] Relying on the role of biomass energy in the carbon cycle, EPA concluded that "it is reasonable to consider generation from [qualified biomass] to be [a] form[] of [renewable energy] generation…." *Id.* at 492. As a result, states implementing the CPP may give qualified biomass the same preferential treatment and incentives as wind or solar energy. EPA's treatment of the

---

[22] *Available at* http://www3.epa.gov/airquality/cpp/cpp-final-rule.pdf.

biomass materials in SPI's permit also is consistent with the record supporting EPA's ongoing evaluation of biogenic $CO_2$ emissions under the CAA. *See* EPA, Memorandum from Janet G. McCabe to Air Division Directors, Regions 1-10, re: Addressing Biogenic Carbon Dioxide Emissions from Stationary Sources 2 (Nov. 19, 2014) ("McCabe Memo") ("Information considered in preparing the second draft of the Framework, including the [SAB] peer review and stakeholder input, supports the finding that use of waste-derived feedstocks and certain forest-derived industrial byproducts are likely to have minimal or no net atmospheric contributions of biogenic $CO_2$ emissions, or even reduce such impacts, when compared with an alternative fate of disposal.")

EPA's treatment of biomass energy in the CPP is consistent with EPA's past practice of recognizing the carbon benefits of forest products and supporting biomass energy as a renewable alternative to fossil fuels that reduces net atmospheric $CO_2$ concentrations in comparison to a fossil fuel baseline. For example, EPA's Mandatory GHG Reporting Rule uses an expansive definition of biomass and excludes biogenic $CO_2$ in its reporting threshold. 40 C.F.R. §§ 98.3(c)(4) and 98.6. The Department of Energy's Voluntary Reporting of Greenhouse Gases Program, authorized by Section 1605(b) of the Energy Policy Act of 1992, also excludes combustion of biomass fuels. DOE, *Technical Guidelines: Voluntary Reporting of*

*Greenhouse Gases (1605(b)) Program* 77 (2007)[23] ("Reporters that operate vehicles using pure biofuels within their entity should not add the carbon dioxide emissions from those fuels to their inventory of mobile source emissions because such emissions are considered biogenic and the recycling of the carbon is not credited elsewhere."). Other governments have also recognized the carbon neutrality of biomass. *See, e.g.,* EU Guidelines for the monitoring and reporting of greenhouse gas emissions, Annex I, 4.2.2.1.6 (Jan. 29, 2004)[24] ("Biomass is considered as $CO_2$-neutral."). Thus, there is well-established and consistent precedent for recognizing and promoting biomass energy as a method of controlling GHG emissions.

## II. EPA POLICY CONCERNING BIOGENIC $CO_2$ EMISSIONS PROPERLY ESTABLISHED A REASONABLE BASIS FOR EVALUATING PROJECTS COMBUSTING BIOMASS

EPA reasonably treated biomass as a renewable resource that is fundamentally distinct than fossil fuel alternatives in GHG BACT analyses. Consistent with the principles described above, EPA's 2011 Biomass BACT Guidance confirms the important role that biomass energy can play in reducing GHG emissions compared to fossil fuel alternatives. EPA, *Guidance for Determining Best Available Control Technology for Reducing Carbon Dioxide Emissions From Bioenergy Production* (2011) ("*Biomass BACT*

---

[23] *Available at* http://www.eia.gov/oiaf/1605/January2007_1605bTechnicalGuidelines.pdf

[24] *Available at* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32004D0156

*Guidance*"), PER 610-44.  The CAA's PSD provisions require permit writers to evaluate each application on a case-by-case basis while considering energy, environmental, and economic impacts.  42 U.S.C. § 7479(3).  EPA's guidance thus appropriately recognizes the overall climate GHG benefits that biomass energy offers, while providing flexibility to incorporate reasonable permit conditions to reduce on-site $CO_2$ emissions to the extent feasible.

EPA's guidance recognizes the importance of the forest carbon cycle and confirms that off-site sequestration of $CO_2$ in forests is relevant to the BACT analysis for biomass energy.  EPA, *Biomass BACT Guidance* at 8, PER 619 ("[B]ecause sequestration of $CO_2$ emissions in living plant material outside the boundary of the facility may counteract the emissions from such facilities on a continuous basis, this unique dynamic merits consideration in the BACT analysis.").  EPA also distinguishes between renewable biomass resources and fossil fuel alternatives, explaining that "$CO_2$ emissions from bioenergy merit unique consideration in the BACT analysis because land-based biomass carbon stocks can be replenished more quickly than fossil fuel carbon stocks, and thus these biogenic carbon stocks can act as a sink on a shorter time scale than fossil carbon."  *Id.* at 6, PER 617.  Recognizing the GHG benefits that biomass energy can offer in comparison to fossil fuels, EPA describes how a permit writer could conclude that biomass combustion is sufficient to qualify as BACT for a biomass energy facility.  In doing so, EPA specifically recognizes that "utilizing mill residue (e.g. sawdust, planar shavings, panel trim) to generate energy,

rather than leaving the residue to decompose, likely would not cause emissions over and above that which would have taken place if the energy use did not occur." *Id.* at 23, PER 634.

While the guidance appropriately recognizes the established benefits and distinctions of biomass energy in comparison to fossil fuels, EPA does not exclude the possibility of further emission reductions on a case-by-case basis. Instead, EPA directs permit writers to follow the same five-step BACT analysis that is used for other types of PSD permits. Thus, a permit writer must still consider potential add-on control technology as well as efficiencies and best practices that can reduce on-site emissions per unit of energy produced. In doing so, the guidance recognizes biomass as an inherently low- or zero-emission fuel source on a net basis, while ensuring that cost-effective and feasible measures to further reduce emissions are also employed.

Petitioners seeks to discount EPA's ability to recognize the climate benefits of biomass energy by citing studies that inappropriately evaluate biomass energy impacts at a stand-based scale rather than a landscape based scale. *See* CBD Br. at 2; CBD Comments at 6, PER 233. To put it bluntly, Petitioners are not seeing the forest for the trees. By focusing solely on changes that take place on individual forest stands at the time of harvest, these studies identify an initial pulse of $CO_2$ emissions from combustion and assert that this "carbon debt" must be repaid as the stand regrows. However, these studies are inconsistent with real-world forest management practices because they ignore the carbon sequestration that takes place on other forest stands.

*See* Section I.B., *supra*. When biomass energy is evaluated at an appropriate geographic scale that is consistent with active forest management regimes, regrowth occurs *simultaneously* with harvests and there is no net emission pulse or carbon debt that must be repaid when biomass is combusted for energy. Further, many of the studies cited by Petitioners inappropriately assume that long-rotation forests will be harvested solely for biomass energy production. *See* CBD Br. at 2 (asserting that combustion of biomass for energy "can increase atmospheric $CO_2$ concentrations for decades or centuries"). Such studies are inapplicable here because both market forces and SPI's PSD permit dictate that long-rotation forests will not be combusted solely for biomass energy. *See*, Section I.B.3, *supra*; EPA Br. at 88.

## III. EPA ACTED REASONABLY AND CONSISTENTLY WITH THE BIOMASS BACT ANALYSIS WHEN IT ISSUED SPI'S PSD PERMIT

In light of the climate benefits that biomass energy offers in comparison to the alternative of meeting the SPI plant's energy needs with fossil fuels, it was reasonable for EPA to use biomass combustion itself as a starting point for a BACT analysis. As described in Section II, *supra*, EPA's *Biomass BACT Guidance* reasonably determined that biomass combustion—by itself—can be considered BACT in appropriate circumstances. SPI's permit application stated that the purpose of the project was to combust waste and surplus biomass fuel to produce steam for the kilns and to generate electricity. *See* SPI Application at 3-4, PER 750-51; *see also* In Re: Sierra Pacific Industries (Anderson Processing Facility), PSD Appeal Nos.13-01,13-02, 13-03

24

& 13-04 at 61 (Jul. 18, 2013), PER 68 ("Sierra Pacific's 'purpose' in proposing this project is to put to use the hundreds of thousands of bone-dry tons of wood waste the lumber company has in the Shasta County region, for the production of lumber and electricity.").

Thus, it was reasonable for EPA to include biomass combustion in Step 1 of its BACT analysis and to use biomass combustion, combined with the design efficiencies and operational best practices included in SPI's permit application, as the starting point from which to evaluate other options for controlling $CO_2$ emissions. Indeed, because it is fully consistent with EPA's long-standing position that biomass energy reduces net GHG emissions in comparison to a fossil fuel baseline, EPA's conclusions here are entitled to deference. *Hawaiian Elec. Co., Inc. v. EPA*, 723 F.2d 1440, 1446 (9th Cir. 1984) ("'The deference normally given administrative agencies in interpreting their own regulations as well as the highly technical nature of the modeling techniques makes the EPA particularly well suited to make the determinations as to whether to issue a PSD permit or not.'" (quoting *Citizens Against Refinery's Effects v. EPA*, 643 F.2d 178, 183 (4th Cir. 1981)).

Furthermore, EPA acted consistently with its own guidance and the CAA's requirements by looking beyond biomass combustion and considering, on a case-by-case basis, whether other options were available to reduce on-site emissions from SPI's proposed facility. Thus, EPA reasonably considered and rejected carbon capture and storage ("CCS") as an add-on emission control. CCS has not developed

technologically and/or economically to the point that it should be considered "available" for purposes of a BACT analysis, and EPA acted appropriately when it eliminated CCS during its BACT analysis. There are no other potential control technologies that reduce $CO_2$ emissions at the stack.

In the absence of any feasible add-on controls, the only potential other methods of reducing on-site GHG emissions are improved efficiency and other best practices, which EPA also considered in its BACT analysis. Implementing these types of projects improves the overall performance of the facility by increasing the amount of electricity produced per unit of fuel input. As a result, SPI and other entities seeking to construct new biomass energy facilities already have a powerful economic incentive to incorporate all feasible energy efficiency options and operational best practices into the initial project design. In light of these benefits, it is not surprising that the energy efficiency improvements and best practices identified by EPA during the BACT analysis were already included in SPI's permit application. Thus, EPA acted reasonably and consistently with the CAA and its own guidance by identifying energy efficiency and best practices—in addition to the combustion of biomass—as BACT for SPI's proposed cogeneration facility.[25]

---

[25] Petitioners' briefs often describe EPA's general guidance on performing BACT reviews as if it imposed statutory or regulatory requirements. *But see* EPA New Source Review Workshop Manual (Draft Oct. 1990) at 1 ("[The manual] is not intended to be an official statement of policy and standards and does not establish binding regulatory requirements; such requirements are contained in the regulations and approved state implementation plans."), *available at*

Further, EPA included a permit condition to limit the types of biomass that SPI could combust at the facility. An alternative fate analysis for these permitted fuels, which include wood waste and mill residuals, provides additional confirmation that combusting biomass for energy is reasonable and consistent with the purpose of the PSD program. Manufacturing residues and forest residuals arise from the harvesting and processing of biomass for the purpose of manufacturing products. In many cases residuals would have to be disposed of—through landfilling, incinerating, wastewater treatment and discharge, or decomposition—if they were not used as an energy source. Because decomposition of woody manufacturing residuals can release far more methane than their combustion for energy recovery, and because methane is a more potent GHG than $CO_2$, disposal of these residuals can, in many cases, result in significantly greater addition of GHGs to the atmosphere, in terms of global warming potential, than from their combustion for energy. *See* NCASI (2014), Miner (2014). In addition, EPA has recognized in other contexts that burning biomass to generate thermal energy or electricity means that fossil fuel will not be burned to meet that same energy demand, thus reducing the build-up of geologically-stored $CO_2$ in the atmosphere.

---

http://www2.epa.gov/sites/production/files/2015-07/documents/1990wman.pdf. As explained here, and as EPA and SPI demonstrate at length in their responsive briefs, EPA did act consistently with its BACT guidance in this case. But even if it had not, that alone would not be enough to show that the permit is inconsistent with the PSD requirements of 42 U.S.C. §§ 7475(a)(4) and 7479(3).

A significant portion of the biomass that will be combusted at the SPI facility would fall under this category of so-called "anyway emissions" because it is produced as part of SPI's manufacturing processes and would be discarded if not combusted for energy production. As EPA has repeatedly recognized, such anyway emissions from biomass energy do not increase net atmospheric $CO_2$ concentrations. *See, e.g.*, McCabe Memo at 2 ("[U]se of…certain forest-derived industrial byproducts are likely to have minimal or no net atmospheric contributions of biogenic $CO_2$ emissions, or even reduce such impacts, when compared with an alternate fate of disposal."); EPA, CPP at 1161-62 ("[U]se of…certain forest-derived industrial byproducts (such as those without alternative markets) are likely to have minimal or no net atmospheric contributions of biogenic $CO_2$ emissions, or even reduce such impacts, when compared with an alternate fate of disposal.").

## IV. EPA ACTED REASONABLY IN SPECIFYING THE BIOMASS FEEDSTOCKS THAT SPI WOULD COMBUST AT ITS BIOMASS ENERGY FACILITY

EPA also acted reasonably and consistently with the purpose of the PSD program when clarifying the biomass feedstocks SPI would combust while declining to conduct a clean fuels analysis that separately evaluated and ranked each type of biomass feedstock that is potentially available for combustion at SPI's proposed facility. Presumably Petitioners would have also demanded that EPA incorporate such a clean fuels analysis into a permit condition that further would limit the types of feedstocks that SPI could combust for energy. Requiring such a detailed analysis of

individual feedstocks is both unnecessary and inconsistent with how the forestry and forest products industries work.

First, the combustion of biomass for energy using the feedstocks specifically authorized by SPI's permit is consistent with the purpose of the PSD program. The feedstocks that SPI proposed to combust—such as waste wood, mill residuals, forest residuals, and non-merchantable forest biomass consisting of byproducts and residuals of forest management activities harvested for the purpose of forest fire fuel reduction or forest stand improvement—all offer GHG benefits because they would otherwise be combusted without energy recovery or decompose. In response to comments, EPA clarified SPI's purpose in seeking the PSD permit by describing which feedstocks would be combusted in the facility and which feedstocks, such as the long-rotation forests that were of concern to Petitioners, would not have been utilized by SPI for energy production. Thus, a feedstock-by-feedstock analysis that further subdivides and limits or prioritizes combustion of biomass feedstocks for energy is unnecessary because it is appropriate to recognize that the authorized biomass feedstocks produce no net $CO_2$ emissions to the atmosphere so long as they result in "anyway" emissions or are sourced from forests with carbon stocks that are stable or increasing. Thus, it was reasonable in this case for EPA to set binding permit conditions consistent with SPI's proposal that necessarily will achieve $CO_2$ reduction goals, without conducting more detailed feedstock-by-feedstock clean fuels analysis.

29

Second, a detailed feedstock-based clean fuels analysis is inconsistent with how the forestry and forest products industries operate in the long term. Feedstock availability for biomass is dependent on market conditions, including those for other forest products that rely on low-value secondary material. Economic changes within the forest products sector can affect availability of and competition for low-value forest material. In light of the interdependence between biomass energy facilities and other industries in the forest products sector, it is essential that biomass energy facilities have flexibility over time to modify the feedstocks that they combust for energy. When siting a new biomass facility and making cost and revenue projections over the life of the facility, it is impossible to know with any certainty how economic conditions may change over time. Thus, to make a long-term commitment to construct a biomass energy facility, it is essential to have flexibility to change feedstocks based on both availability and price competition. A PSD permit that narrowly restricts the permissible feedstocks could have significant repercussions if the allowable feedstocks either became unavailable or became too expensive over time. Instead, a PSD permit that is inclusive of categories of biomass that reduce net GHG emissions in comparison to fossil fuels will meet the PSD programs' goals of reducing GHG pollution while ensuring operational flexibility.

## CONCLUSION

For the foregoing reasons, the amici agree with EPA's decision to issue a PSD permit to SPI and urge the Court to deny the petitions for review.

30

Dated:  October 9, 2015

Respectfully submitted,

/s/  James R. Wedeking
Roger R. Martella, Jr.
Joel F. Visser
James R. Wedeking
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
Tel: (202) 736-8000
Fax: (202) 736-8711
jwedeking@sidley.com

*Counsel for American Wood Council
and National Alliance of Forest
Owners*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and (6), because it is written in 14-pt Garamond font, and with the type-volume limitations of Rules 32(a)(7)(B)(i) and 29(d) because it contains 6670] words, excluding the portions of the brief excluded under Rule 32(a)(7)(A)(iii).  The count is based on the word-count feature of Microsoft Word 2013, as supplemented by a manual count of the words in Figure 1.

Dated: October 9, 2015                    /s/ James R. Wedeking
                                          _____
                                          James R. Wedeking

## CERTIFICATE OF SERVICE

I hereby certify that the copies of the foregoing Brief of Amici Curiae American Wood Council and National Alliance of Forest Owners was served, this 9th day of October, 2015, through CM/ECF on all registered counsel.

/s/ James R. Wedeking
James R. Wedeking